# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2358

_____

Sagi Barzilay,                                  *
                                                *
    Plaintiff-Appellant,                    *
                                                *  Appeal from the United States
v.                                              *  District Court for the
                                                *  Eastern District of Missouri.
Tamar Barzilay,                                 *
                                                *
    Defendant-Appellee.                     *

_____

Submitted: January 13, 2010
Filed: April 2, 2010

_____

Before MURPHY and BYE, Circuit Judges, and STROM, District Judge.[1]

_____

MURPHY, Circuit Judge.

Sagi Barzilay appeals from the district court's[2] dismissal of his petition under the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 et seq., and the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention). The petition claimed that Sagi's former wife, Tamar, had wrongfully retained their three children in Missouri, where they had lived since 2001,

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

[2]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

and sought an order compelling their relocation to Israel. We remanded to the district court for its consideration of the merits of the petition in Barzilay v. Barzilay, 536 F.3d 844, 853 (8th Cir. 2008). The district court dismissed the petition after determining that the children's country of "habitual residence" within the meaning of the Hague Convention was the United States and that their retention in Missouri was therefore not wrongful. Sagi timely appealed, and we affirm.

I.

Sagi and Tamar, both Israeli citizens, were married in Israel in 1994.[3] The eldest of their three children, born in Israel in 1996, is also an Israeli citizen. In 2001, Sagi and Tamar obtained American work visas through their employer and moved with their first child to Missouri from the Netherlands, where they had resided for approximately two years. The younger two Barzilay children were born in Missouri, in 2002 and 2004. They hold dual Israeli and American citizenship. Tamar and the children have resided in Missouri since 2001. The eldest child has not lived in Israel since her early years; the younger two have never lived there.

In January 2005 a Missouri state court dissolved Sagi and Tamar's marriage. The divorce decree awarded them joint physical and legal custody of the children and incorporated a written parenting plan. The parenting plan specified that Tamar would have "primary parental responsibility and physical custody" of the children. It also included the following provision (referred to below as the repatriation agreement):

> In the event either party leaves Missouri to return to the State of Israel, and regardless of whether such move is voluntary or involuntary on her or his part, the other party shall forthwith take such steps to move back

_____

[3]Because the parties share a last name, we refer to them by their first names for the sake of clarity.

-2-

to Israel so that Husband and Wife and the children shall reside within the same country.

Sagi moved back to Israel in September 2005 and soon began pressuring Tamar to comply with the repatriation agreement. Tamar resisted committing to a definite timeline, but agreed to take the children to Israel for a summer visit in June 2006. She planned to return with them to Missouri on July 9.

While Tamar and the children were visiting Israel, Sagi sought and obtained an ex parte order from the family court in Kfar Saba prohibiting the removal of the children from the country. He argued that Tamar had violated the repatriation agreement by failing to make arrangements to move back to Israel with the children and sought to compel her compliance. At or about the same time, he filed a petition in the Kfar Saba court under the Hague Convention. Tamar retained Israeli counsel and, after intensive negotiations, the parties reached an agreement only hours before she and the children were to catch their flight back to Missouri. Sagi withdrew his pending claims, and the Kfar Saba court gave the parties' agreement (referred to here as the consent judgment) the "status of a verdict."

The consent judgment provided, inter alia, that Tamar and the children would repatriate to Israel by August 1, 2009 and that failing to do so could be "regarded as kidnapping as stated in The Hague treaty." It also provided that Tamar would not take any further action in the Missouri family court and that the "sole and only international authority in regards to the minors' immigration, repatriation and custody shall be the authority of the court in Kfar Saba."[4]

---

[4]It appears that no questions were raised as to the court's jurisdiction over the custody dispute or the substantive law applicable to it, since the court did not inquire into these matters until much later.

Tamar now asserts that her assent to the consent judgment was coerced, that she signed it only so she would be allowed to leave Israel with the children, and that she never intended to abide by its terms. Nor did she. Sagi therefore returned to the Kfar Saba court in December 2006, seeking an order of contempt because Tamar had refused to permit the children to visit Israel in accordance with the consent judgment. Tamar challenged the validity of the judgment, but the Kfar Saba court held her in contempt and its decision was affirmed on appeal.

Meanwhile, Tamar petitioned the Missouri court to remove the repatriation agreement from the original custody decree and limit Sagi's visitation rights. Sagi challenged the Missouri court's jurisdiction, but it nevertheless modified the custody decree in Tamar's favor.[5]

Sagi commenced this action by filing an ICARA petition in the district court in October 2007, claiming that Israel was the children's state of habitual residence within the meaning of the Hague Convention and seeking an order compelling them to move there. The district court determined that these claims had been raised in the Missouri court and therefore abstained from reaching the merits of the petition. We reversed, concluding that the Hague Convention issues had not been properly raised or fully addressed in the state court and that abstention was consequently inappropriate. See Barzilay, 536 F.3d at 852–53. We therefore remanded to the district court for consideration of the merits. After an evidentiary hearing and argument on the Hague Convention issues, the district court determined that the children's country of habitual residence was the United States. Because retention of a child in the state of its habitual residence is not wrongful under the Convention, it dismissed Sagi's petition.

_____

[5]Following our remand, the district court entered an order staying the state court proceedings pending the disposition of Sagi's ICARA petition.

Sagi timely appealed. His primary argument on appeal is that the repatriation agreement in the Missouri custody decree and the consent judgment from the Kfar Saba court conclusively establish that the children's state of habitual residence is Israel, and that the district court erred in failing to give effect to these agreements.

Determination of habitual residence under the Hague Convention raises mixed questions of law and fact, and we therefore review the district court's decision de novo. Sorenson v. Sorenson, 559 F.3d 871, 873 (8th Cir. 2009) (citing Silverman v. Silverman, 338 F.3d 886, 896 (8th Cir. 2003) (en banc)). We defer to the district court's underlying factual findings, however, unless they are clearly erroneous. Id.

II.

A.

The Hague Convention, to which the United States and Israel are both signatories, was adopted to address the problem of child abduction by family members, which not infrequently occurs in connection with transnational custody disputes. The Convention's purpose is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." Convention on the Civil Aspects of International Child Abduction, Preamble, concluded Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 98. The Convention seeks to deter abduction by "depriv[ing] [the abductor's] actions of any practical or juridical consequences." Elisa Pérez-Vera, Explanatory Report, in 3 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 429 (1982) ("Pérez-Vera Report").[6] It accomplishes this goal not by establishing

_____

[6]Elisa Pérez-Vera was the official Hague Conference reporter for the Convention. Her explanatory report "is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the

any substantive law of custody, but rather by acting as a forum selection mechanism, operating on "the principle that the child's country of 'habitual residence' is 'best placed to decide upon questions of custody and access.'" Villegas Duran v. Arribada Beaumont, 534 F.3d 142, 146 (2d Cir. 2008) (quoting Pérez-Vera Report at 434–35). The purpose of proceedings under the Hague Convention is thus not to establish or enforce custody rights, but only "to 'provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed.'" Barzilay, 536 F.3d at 850 (quoting Yang v. Tsui, 416 F.3d 199, 203 (3d Cir. 2005)).

In the United States, a person invokes the protections of the Convention by filing a petition in state or federal court under ICARA. 42 U.S.C. § 11603(a), (b) (2006). The court then "shall decide the case in accordance with the Convention." Id. § 11603(d). The petitioner bears the burden of proving "that the child has been wrongfully removed or retained within the meaning of the Convention." Id. § 11603(e)(1)(A).

"The key inquiry under the Convention is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence." Barzilay, 536 F.3d at 847. According to the Convention,

> The removal or the retention of a child is to be considered wrongful where:
>
> (a)     it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

meaning of the provisions of the Convention." Dep't of State, Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10,494, 10,503 (Mar. 26, 1986).

(b) At the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3.

Thus, in order to determine whether an ICARA petition merits relief, "a court must . . . determine when the removal or retention took place, what the habitual residence of the child was immediately prior to the removal, whether the removal or retention violated the petitioner's custody rights under the law of [the] habitual residence, and whether the petitioner was exercising those rights at the time of the removal [or retention]." Barzilay, 536 F.3d at 847 (citing Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001)). "Once it is determined that a child who was habitually residing in a contracting state was wrongfully removed to or retained in another, the Convention requires that the country in which the child is located 'order the return of the child forthwith.'" Id. (quoting Hague Convention art. 12).

Proceedings under the Hague Convention and ICARA do not reach the merits of an underlying custody dispute. See Hague Convention art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."). Rather, "[t]he district court is to ascertain 'only whether the removal or retention of a child was "wrongful" under the law of the child's "habitual residence," and if so, to order the return of the child to the place of . . . "habitual residence" for the court there to decide the merits of the custody dispute.'" Barzilay, 536 F.3d at 847 (quoting Shalit v. Coppe, 182 F.3d 1124, 1128 (9th Cir. 1999)).

B.

As the district court correctly understood, this case turns on the determination of the children's habitual residence, for the retention of a child in the state of its habitual residence is not wrongful under the Convention. See Silverman, 338 F.3d at 897 n.17. Because the Barzilay children had lived in Missouri for approximately five years before their alleged wrongful retention commenced, the district court concluded their country of habitual residence was the United States. The court's factual findings, which we accept unless clearly erroneous, Sorenson, 559 F.3d at 873, unequivocally support that conclusion. The district court therefore did not err in dismissing the petition.

The first step in determining a child's habitual residence is to discern when the alleged wrongful removal or retention took place, for "the text of the Convention directs courts to only one point in time in determining habitual residence: the point in time 'immediately before the removal or retention.'" Silverman, 338 F.3d at 897 (quoting Hague Convention art. 3). Because this case does not present the typical abduction scenario, it is not entirely clear when the alleged wrongful retention commenced.[7] Based on Sagi's testimony and a series of emails exchanged between the parties, the district court determined that it began in early Spring 2006, by which time Sagi had informed Tamar that he considered her to be in breach of the repatriation agreement.

We agree with the district court's reasoning. The alleged wrongful retention must have begun between September 2005, when Sagi moved back to Israel, and Sagi's filing in the Kfar Saba court, when he first formally asserted his rights under

---

[7]When asked at the evidentiary hearing when he believed the wrongful retention of the children began, Sagi answered, "I don't have a specific date. It's evolving."

the Convention. No more precise answer is necessary, for there was no significant change in the children's living arrangements during that period of time.

Having concluded that the alleged wrongful retention began in early 2006, the district court proceeded to consider the factors relevant to the determination of habitual residence: "the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country." Barzilay, 536 F.3d at 851–52 (citing Silverman, 338 F.3d at 897–98).

The "settled purpose" of a family's move to a new country is a central element of the habitual residence inquiry. Silverman, 338 F.3d at 898. "This settled purpose need not be to stay in a new location forever, but the family must have a 'sufficient degree of continuity to be properly described as settled.' . . . Additionally, the settled purpose must be from the child's perspective, although parental intent is also taken into account." Id. (quoting Feder v. Evans-Feder, 63 F.3d 217, 222–23 (3d Cir. 1995)). Because two of the Barzilay children had lived their whole lives in Missouri, the eldest had lived there for five years, and there was no indication in the record that the children had spent any significant amount of time in another country, the district court concluded that from the children's perspective, the settled purpose of the family's residence in Missouri was to remain there permanently.

As the district court noted, the intent of the parents in this case is less clear. Sagi and Tamar moved to the United States on temporary work visas, and it is therefore uncertain whether they intended to remain here permanently. Nevertheless, because the record did not indicate that the family maintained a home or other property in Israel (nor did it disclose any other evidence of an intention to return to Israel), the district court concluded that Sagi and Tamar abandoned their prior habitual residences when they moved to Missouri and intended to stay there indefinitely. See id. (district court should consider "the family abandoning its prior residence and

-9-

selling the house"); cf. Mozes, 239 F.3d at 1075 ("If you've lived continuously in the same place for several years on end, . . . we would be hard-pressed to conclude that you had not abandoned any prior habitual residence."). The district court also considered the repatriation agreement as potential evidence of the parties' intent. Since the agreement was conditional and gave no indication of actual intent to move back to Israel at a particular time, however, the court concluded that it was not an expression of settled intent, but rather a precautionary measure.

Finally, the district court considered "the change in geography, the passage of time, and the acclimatization of the child[ren] to the new country." Barzilay, 536 F.3d at 851–52. It concluded that the children were well acclimatized to life in the United States. The eldest child was, after all, the only one who had experienced a significant change in geography, and by 2006 she had been in the United States for approximately five years—half of her life. The younger two had lived their entire lives in Missouri. In addition, the children of school age had been attending school in the United States; none of them had gone to school in Israel.

Based on the foregoing considerations, we agree with the district court's conclusion that the children's country of habitual residence under the Hague Convention was the United States. Sagi has pointed to no evidence suggesting the district court's factual findings are clearly erroneous or that its analysis is otherwise unsound. Indeed, he has offered no evidence that his children have spent any significant amount of time outside the United States since 2001 or that they have been given any reason to believe their home is anywhere but Missouri. The United States is the country where the Barzilay children have spent most or all of their young lives, and there can be little question that it is consequently their habitual residence within the meaning of the Hague Convention. See Sorenson, 559 F.3d at 874 (child's habitual residence was the country where she "had spent the overwhelming majority of her life" and had "the majority of her connections").

Indeed, Sagi does not seriously challenge the district court's habitual residence determination on factual grounds. Rather, he argues that he and Tamar stipulated—both in the Missouri repatriation agreement and in the Kfar Saba consent judgment—that the children's country of habitual residence was Israel, and that the district court erred in failing to give effect to these agreements. Sagi offers two distinct theories in support of this argument. First, he claims that the Kfar Saba consent judgment renders the matter of habitual residence res judicata and was entitled to recognition in the district court. Second, he argues that these agreements as to habitual residence should be enforceable in the manner of contracts.

We reject both arguments. The first need not delay us long, for the Kfar Saba court itself has determined that the consent judgment has no force in these proceedings. Subsequent to oral argument on this appeal, Tamar's counsel provided the court with a translation of the Kfar Saba court's recent decision on her challenge to its jurisdiction. Barzilai v. Barzilai, File 17971-06 (Family Court in Kfar Saba, Israel Jan. 11, 2010). In that decision, the Kfar Saba court stated that the United States is "the customary place of residence of the minor children," id. at 7, and that "there is no escaping the conclusion that the jurisdiction to judge the matter of custody and visitation rights of the children of the parties is given to the authorities in the United States," id. at 8. It therefore ordered that "all the proceedings referring to custody of the minor children and arrangements for visitation with the respondent are to be canceled in this court." Id.

Even without the benefit of the Kfar Saba court's analysis, we would conclude that the district court was correct in affording the consent judgment no preclusive effect. The Ninth Circuit has recognized that "federal courts adjudicating Hague Convention petitions must accord full faith and credit only to the judgments of those state or federal courts that actually adjudicated a Hague Convention claim in accordance with the dictates of the Convention." Holder v. Holder, 305 F.3d 854, 864 (9th Cir. 2002) (citing 42 U.S.C. § 11603(g)). The same principle applies to

judgments of foreign courts. <u>See</u>, <u>e.g.</u>, Restatement (Third) of the Foreign Relations Law of the United States § 481 & cmt. c ("A foreign judgment is generally entitled to recognition by courts in the United States to the same extent as a judgment of a court of one State in the courts of another State."); <u>cf.</u> Carrascosa v. McGuire, 520 F.3d 249, 262–63 (3d Cir. 2008) (American courts had no obligation to enforce judgments of foreign courts which were not "in accordance with the Hague Convention"), <u>cert.</u> denied, 129 S. Ct. 491 (2008).

The Kfar Saba consent judgment did not actually adjudicate a Hague Convention claim. Despite the conclusory statement that "[n]ot returning the minors to the state of Israel by the appointed time is regarded as kidnapping as stated in the Hague Treaty," the consent judgment is silent on the "key inquir[ies] under the Convention"—habitual residence and wrongful removal or retention. <u>Barzilay</u>, 536 F.3d at 847. Because it did not actually determine the relevant issues, the consent judgment would have no preclusive effect in these proceedings. <u>See</u>, <u>e.g.</u>, <u>Ripplin Shoals Land Co., LLC v. U.S. Army Corps of Engineers</u>, 440 F.3d 1038, 1044 (8th Cir. 2006) (collateral estoppel applies only when issue to be precluded is "identical to the issue previously decided" and "the prior action resulted in a final adjudication on the merits").

We also reject the claim that either the Kfar Saba consent judgment or the Missouri repatriation agreement is an enforceable stipulation of the children's habitual residence. We have held that "[h]abitual residence may only be altered by a change in geography and passage of time." <u>Silverman</u>, 338 F.3d at 898. It follows that it may not be altered by simple parental fiat. In other words, "[w]hile the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone." <u>Mozes</u>, 239 F.3d at 1078. The notion that parents can contractually determine their children's habitual residence without regard to the actual circumstances of the children is thus entirely incompatible

with our precedent. Indeed, Sagi has not cited a decision by any court anywhere in the world embracing such a proposition.

As the discussion above makes clear, determination of habitual residence under the Hague Convention is a fact intensive inquiry particularly sensitive to the perspective and circumstances of the child. See Silverman, 338 F.3d at 898–99; Mozes, 239 F.3d at 1081 ("Habitual residence is intended to be a description of a factual state of affairs."); Pérez-Vera Report at 445 (habitual residence is "a question of pure fact"). To allow parents simply to stipulate to any habitual residence they choose would render these factual considerations irrelevant. Moreover, while our cases recognize parental intent as "relevant," Sorenson, 559 F.3d at 874, to enforce the agreements in this case would render it dispositive.

Any idea that parents could contractually determine their children's habitual residence is also at odds with the basic purposes of the Hague Convention. The Convention seeks to prevent the establishment of "artificial jurisdictional links" as a means to remove the child from the "family and social environment in which its life has developed." Perez-Vera Report at 428. It is difficult to imagine a jurisdictional link more artificial than an agreement between parents stating that their child habitually resides in a country where it has never lived.

Setting aside these general considerations, Sagi's claim that the consent judgment and repatriation agreement determine his children's habitual residence fails for the simple reason that those agreements are not stipulations of habitual residence. Sagi's characterization of them as such, with virtually no reference to their actual terms, is little more than ipse dixit. Neither of them uses the term "habitual residence" or says anything about the relevant facts.

It is apparent upon examination of the rights the repatriation agreement and consent judgment purport to establish that the two agreements are best understood as

substantive custody decrees. The repatriation provision is a prospective, conditional agreement requiring the whole family to live in Israel in case one parent were to move there. Its purported effect would be to give Sagi a right to require Tamar and the children to live in Israel.[8] The Kfar Saba consent judgment purports to modify and enforce the repatriation agreement, thus giving Sagi a legal right to determine where his children live. Such a right seems to come within the Convention's definition of "rights of custody," which "include . . . in particular, the right to determine the child's place of residence." Hague Convention art. 5.

Thus, while Sagi characterizes the Missouri repatriation agreement and the Kfar Saba consent judgment as prospective stipulations of habitual residence, they are in fact custody decrees.[9] Indeed, Sagi must agree with that proposition, for they are the bases for his claim that retention of the children in Missouri is wrongful. See Hague Convention art. 3 ("The removal or retention of a child is to be considered wrongful where . . . [i]t is in breach of rights of custody attributed to a person . . . ."). Once the agreements are seen in this way, the fundamental problem with Sagi's argument becomes clear. He is trying to use the Hague Convention as a vehicle to enforce his

---

[8]Tamar maintains that the repatriation agreement is in fact void on its face. See McCreary v. McCreary, 954 S.W.2d 433, 451–52 (Mo. App. 1997) ("Under [Mo. Rev. Stat.] § 452.325.2 . . . the trial court is not bound by the parties' agreements as to child custody . . . ."). Under the Convention that is a determination left to the courts of the children's habitual residence.

[9]We need not decide whether these two agreements do indeed give rise to "rights of custody" cognizable under the Convention. That can be a complex question. Compare Croll v. Croll, 229 F.3d 133, 135 (2d Cir. 2000) (parental access rights coupled with ne exeat order did not constitute rights of custody under the Convention) with Furnes v. Reeves, 362 F.3d 702, 714 (11th Cir. 2004) (ne exeat order gave father right of custody under Convention). We will assume, for illustrative purposes only, that they do, because if the agreements do not give Sagi "rights of custody" under the Convention, then retention of the children in Missouri would not be wrongful and his petition would fail in any event.

-14-

custody rights, simply by relabeling them as stipulations of habitual residence.[10] Regardless of how they are labeled, however, these agreements amount to provisions relating to the custody of the children, and "the Convention is certainly not a treaty on the recognition and enforcement of decisions on custody." Perez-Vera Report at 435.

While Sagi has framed this case as a complex matter of first impression, it is in fact relatively simple. Immediately before the alleged wrongful retention in this case began, the children's habitual residence under the Hague Convention was in Missouri, where they had lived without interruption for five years. Under the Convention, it was consequently for the courts of Missouri to determine whether Tamar's refusal to bring the children back to Israel was indeed wrongful and if so, to fashion an appropriate remedy. Instead of seeking to enforce his custody rights in the Missouri courts, however, Sagi went to the court in Kfar Saba because, as he candidly testified in the district court, "it proposed better chances for me winning." Having obtained a favorable judgment there, he then turned to the federal court seeking enforcement of his newly minted custody rights through an ICARA petition. This course of litigation not only betrays a fundamental misunderstanding of the Hague Convention, but also precisely the sort of international forum shopping the Convention seeks to prevent. The district court correctly withheld the relief Sagi requested.

## III.

The district court did not err in concluding that immediately before the alleged wrongful retention in this case commenced, the Barzilay children's country of habitual residence was the United States, and that their retention in Missouri was therefore not

[10]Indeed, Sagi testified before the district court that he sought relief in the Kfar Saba court in order "to enforce the Missouri judgment," and the remedy he sought in the district court was "[e]nforcement of the Israeli judgment and Missouri judgment."

wrongful under the Hague Convention.  We affirm the judgment of the district court denying the petition.

_____