# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2019      Decided December 27, 2019

No. 19-7110

SAMI ABOU-HAIDAR,
APPELLEE

v.

MARIA EUGENIA SANIN VAZQUEZ,
APPELLANT

———

Consolidated with 19-7141

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:19-cv-01687)

———

*Joseph J. DiPietro III* argued the cause for appellant. With him on the briefs was *Sakeena Farhath*.

*Stephen J. Cullen* argued the cause for appellee. With him on the brief were *Kelly A. Powers* and *Leah M. Hauser*.

*Sharon Swingle* and *Lewis S. Yelin*, Attorneys, U.S. Department of Justice, were on the brief for *amicus curiae* United States of America.

Before: MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The 1980 Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention) seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence."  Hague Convention, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, preamble.  The "problem with which the Convention deals . . . derives all of its legal importance from the possibility of individuals establishing legal and jurisdictional links which are more or less artificial" in order to "change the applicable law and obtain a judicial decision favourable to [them]."  Elisa Pérez-Vera, Explanatory Report ¶ 15 (Pérez-Vera Report).[1]  To combat this problem, the Convention seeks to achieve the "restoration of the *status quo*" in international custody disputes, *id.* ¶ 16, ensuring that courts of the child's habitual residence make the ultimate custody determination.  A decision pursuant to the Convention does not constitute a "determination on the merits of any custody issue."  Hague Convention, art. 19.  Instead, the "central operating feature" of the Convention is its petition remedy, through which a party who claims a breach of custody rights may petition for the

---

[1] Elisa Pérez-Vera was the official Hague Conference reporter, and the State Department has explained that her report "is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it."  Dep't of State, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (March 26, 1986).  The Supreme Court has reserved the question of what weight to accord the report, *Abbott v. Abbott*, 560 U.S. 1, 19 (2010), and we need not resolve that question here.

child's return to the child's country of habitual residence where any custody adjudication appropriately would occur. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010).

In this case, petitioner Sami Abou-Haidar claims that his wife, María Eugenia Sanin Vazquez, wrongfully retained their five-year-old daughter in the United States. The family moved from France to the United States so that Sanin Vazquez could fulfill an eighteen-month assignment as a consultant at the Inter-American Development Bank in Washington, D.C. The couple planned to live in the United States at least until Sanin Vazquez's contract with the Bank expired on December 31, 2019. Within six months of arriving in the United States, however, the marriage began to deteriorate, prompting Sanin Vazquez to take a series of actions—including unilaterally filing for primary physical custody in D.C. Superior Court— contrary to the couple's previous, joint understanding of where they would live together with their child. The district court concluded that Sanin Vazquez's actions constituted a retention, and that the retention was wrongful because it breached Abou-Haidar's custody rights under the laws of the child's habitual residence, which the court held was France. Because Sanin Vazquez has not identified any reversible error in the district court's factual findings or legal conclusions, we affirm the district court's judgment granting Abou-Haidar's petition for return.

**I.**

In October 2013, Sami Abou-Haidar and María Eugenia Sanin Vazquez married in Paris. Abou-Haidar, a citizen of France, Italy, and Lebanon, is an emergency doctor who provides house-call services. Sanin Vazquez, a citizen of Spain and Uruguay, is a professor of Economics at the University of Évry Val-d'Essonne, near Paris. The couple had a daughter in

Paris in early 2014. Before July 2018, the family lived primarily in a rented apartment in Paris. The family also spent several months at a time at a Barcelona apartment they owned, but there is no serious dispute that France, not Spain, was the family's habitual residence before their move to the United States.

In January 2018, the Inter-American Development Bank offered Sanin Vazquez a consultancy in Washington, D.C. The initial contract offer was for an eighteen-month term, renewable after a six-month period of separation. Because both Sanin Vazquez and Abou-Haider thought Sanin Vazquez might accept a renewal but only if it could be done continuously, Sanin Vazquez renegotiated the Bank offer in early June 2018 to permit renewal, at the Bank's discretion, for a second eighteen-month term without a six-month period of separation. With the renegotiated terms in hand, Sanin Vazquez agreed to serve as a Bank consultant from July 1, 2018 through December 31, 2019.

The parties then took several steps to prepare for their departure from France. Sanin Vazquez requested a *détachement*—a temporary assignment or secondment—from her university for eighteen months, but maintained her university affiliation, her doctoral students, and her French pension. Abou-Haidar kept his Paris job but planned to work for ten to twelve consecutive days each month in France and spend the balance of the month in Washington. To reduce costs, the couple rented out their Barcelona apartment for three years and moved out of their rented Paris apartment, leaving their furniture and large appliances in a storage unit in the same building. For the days he would spend in Paris, Abou-Haidar arranged to live in another, smaller Paris apartment that he owned, which he otherwise continued to rent out during the part of each month he spent in Washington.

The couple took other steps in preparation for the move to Washington. Sanin Vazquez obtained G-4 diplomatic visas for the family valid for five years. As reflected in their text messages and emails, the couple collaborated on finding a residence to purchase in Washington, potentially with financial assistance from Sanin Vazquez's mother. After making an unsuccessful bid on a house, they instead decided to rent an apartment in the Woodley Park neighborhood. Abou-Haidar took some initial steps toward obtaining a medical license in Uruguay in anticipation of the family perhaps moving there after Sanin Vazquez's Washington consultancy, but he made no effort to obtain an American medical license.

The couple moved into their rented Washington apartment on July 1, 2018 (shifting units within the building in March 2019). They enrolled their child in a nearby public Spanish-English bilingual elementary school. The child is now nearly six years old, has friends at her school, and participates in soccer and other extracurricular activities.

By December 2018, however, the couple began to experience marital discord. As the marriage deteriorated, Sanin Vazquez unilaterally took action to establish her primary physical custody over the child. On May 2, 2019, Sanin Vazquez filed a Complaint for Custody in D.C. Superior Court, seeking "primary physical custody" and "joint legal custody" of the child. J.A. 915. Sanin Vazquez did not tell Abou-Haidar about the filing until five days later when, on May 7, she notified him of the complaint and of her desire for a marital separation. Immediately thereafter, Abou-Haidar received service of the Superior Court complaint. On May 10, Sanin Vazquez told Abou-Haidar that she planned to stay in Washington, D.C. with their daughter after December 31 instead of returning to France. Finally, on May 31, Sanin Vazquez's family law attorney wrote to Abou-Haidar that their

Washington apartment had "never been the marital residence" and that Sanin Vazquez had "changed the locks on her apartment." J.A. 1296.

Abou-Haidar responded to these developments with several actions of his own. First, on May 23, 2019, Abou-Haidar filed an answer and counterclaim in D.C. Superior Court, seeking "joint physical and legal custody" of their daughter. J.A. 81-85. Then, changing course on June 6, Abou-Haidar withdrew his Superior Court answer and counterclaim and instead sought assistance from the French Central Authority, the entity designated by France under the Hague Convention to collaborate across international borders to process applications arising under the Convention. *See* Hague Convention, arts. 6-8. On June 10, before hearing back from the French Central Authority, Abou-Haidar also filed a Hague Convention petition in the U.S. District Court in Washington for return of their daughter to France. As urged by the Convention, the district court scheduled the case for prompt disposition. *See* Hague Convention, art. 11 (encouraging courts to rule on petitions within six weeks). Following that filing, the D.C. Superior Court stayed any determination of the custody aspects of Sanin Vazquez's complaint pending resolution of this case. About two weeks later, the French Central Authority dismissed Abou-Haidar's application in a one-page letter, stating that the "presence of your daughter in the United States is not unlawful since it was decided by the parental couple which holds the parental authority." J.A. 1015.

The district court held an evidentiary hearing on August 1-2, 2019. In a brief August 21 order, which the court specified would be followed by a more detailed opinion, the court concluded that Abou-Haidar had "proven by a preponderance of the evidence that the mother, Respondent María Eugenia Sanin Vazquez, has wrongfully retained [the child] within the

meaning of the Convention." J.A. 150. Specifically, the court held that Sanin Vazquez had retained the child on May 7, 2019 when she served Abou-Haidar with her Superior Court complaint, or at the latest on May 23, 2019, when Abou-Haidar filed his Superior Court answer and counterclaim seeking to maintain joint custody. J.A. 152 & n.1. The court further held that the child's habitual residence was France because, "based on the full record," the "parties did not leave France in a manner that would suggest a shared intent to relocate indefinitely to the United States," and evidence of the child's acclimatization to the United States did not supplant that intent. J.A. 153-54. Finally, the court held that the retention was wrongful because Sanin Vazquez did not dispute that the retention violated the French custodial rights that Abou-Haidar was exercising at the time of the retention. J.A. 154.

The district court ordered the parties to confer and agree on a date for the child's return to France. On October 9, 2019, the district court issued its Findings of Fact and Conclusions of Law. J.A. 161-82. Because the parties had not settled on a return date, the district court at that time also ordered the child's return to France by December 31, 2019. J.A. 183.

Sanin Vazquez timely appealed both the district court's August 21 and October 9 orders, and the appeals were consolidated. She also sought and received expedited consideration from this court so that the district court's decision could be reviewed prior to the expiration of her first Bank contract on December 31. On December 4, we invited the United States to offer its views on the legal questions in this case.[2] We heard argument on December 5 and now affirm the district court's judgment.

---

[2] We thank the government for promptly submitting an invited amicus brief on short notice.

## II.

## A.

The Hague Convention, adopted in 1980, seeks to "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. The Convention is "especially aimed at the unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005) (citing Paul R. Beaumont & Peter E. McEleavy, The Hague Convention on International Child Abduction 1-3 (1999)). Decisions under the Convention do not resolve the underlying custody disagreement. *See* Hague Convention, art. 19. Rather, the courts of the Contracting States apply the Convention to determine the lawful forum to decide international custody disputes. The Convention directs that they do so by reference to the status quo preceding the unilateral actions that gave rise to the dispute. *Id.*, art. 3.

More specifically, the Convention creates two routes by which a parent may act to ensure that the courts of the state that was the child's habitual residence make the ultimate custody determination.[3] First, the Convention requires each Contracting State to set up a "Central Authority." *Id.*, art. 6. Those entities are required to "co-operate with each other and

---

[3] We use "parent" as a shorthand here and throughout because parents are the typical parties on both sides. But our shorthand should not obscure that the Convention covers all situations where anyone wrongfully removes or retains a child in "breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone." Hague Convention, art. 3(a).

promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children." *Id.*, art 7. A person seeking relief under the Convention may file an application with a Central Authority, which may, among other functions, help to "discover the whereabouts of a child," "bring about an amicable resolution of the issues," and arrange for the child's "safe return." *Id.* Applications may be refused "[w]hen it is manifest that the requirements of this Convention are not fulfilled or that the application is otherwise not well founded." *Id.*, art. 27.

Second, and relevant here, the Convention also authorizes individuals to petition the judicial or administrative authorities where the child currently is located for return of the child to her place of habitual residence. *Id.*, art. 12. An order requiring return is appropriate only where the petitioning parent can demonstrate that the child has been "wrongfully" removed or retained. Despite its charged valence, "wrongful" removal or retention is a term of art defined in the Convention that need not involve what is usually thought of as "abduction." The "retention of a child is to be considered wrongful" where, as applicable here, "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before" the retention. *Id.*, art. 3. The Convention further defines "rights of custody" to encompass "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.*, art. 5(a). Finally, Article 12 of the Convention provides the return remedy to address situations of wrongful removal or retention, stating that where "a child has been wrongfully removed or retained in terms of Article 3" and a petition has been filed within a year of the removal or retention, the "authority concerned shall order the return of the child forthwith." *Id.*, art. 12; *see generally Chafin v. Chafin*, 568 U.S. 165, 168-69 (2013).

Later sections of the Convention provide for exceptions to this remedy of return "forthwith." Hague Convention, art. 12. As the Supreme Court has summarized, "Return is not required if the parent seeking it was not exercising custody rights at the time of removal or had consented to removal, if there is a 'grave risk' that return will result in harm, if the child is mature and objects to return, or if return would conflict with fundamental principles of freedom and human rights in the state from which return is requested." *Chafin*, 568 U.S. at 169 (citing Hague Convention, arts. 13, 20); *see also Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014). None of those exceptions is raised in this case.

Both the United States and France are Contracting States to the Hague Convention. Each has set up a Central Authority, as required, to receive Hague Convention applications. After ratifying the Convention in 1988, the United States implemented its provisions through the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, 22 U.S.C. § 9001 *et seq*. Consistent with the Convention, Congress declared in ICARA that the "Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims," *id.* § 9001(b)(4), and insisted that "[p]ersons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention," *id.* § 9001(a)(2). In addition, Congress specified how Hague petitions may be filed in the United States, giving state and federal courts concurrent jurisdiction to hear such claims, *id.* § 9003(a), and requiring that courts "decide the case in accordance with the Convention," *id.* § 9003(d). Congress also specified that the burden is on the petitioner to "establish by a preponderance of the evidence" that the child "has been wrongfully removed or retained within the meaning of the Convention." *Id.* § 9003(e)(1)(A). Finally, Congress provided

that, where that burden is met, the child is to be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

**B.**

This is the first case arising under the Hague Convention that has reached our court. In interpreting the Convention's and ICARA's various requirements, other circuits often distill analysis of whether a petition for return should be granted into a four-part inquiry, which the parties from the outset have expressly embraced and continue on appeal to agree is applicable:

> (1) When did the removal or retention at issue take place?

> (2) Immediately prior to the removal or retention, in which state was the child habitually resident?

> (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?

> (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001); *see also, e.g.*, *Monzon v. De La Roca*, 910 F.3d 92, 100 (3d Cir. 2018); *Redmond v. Redmond*, 724 F.3d 729, 737-38 (7th Cir. 2013); *Barzilay v. Barzilay*, 600 F.3d 912, 917 (8th Cir. 2010); *see also* U.S. Amicus Br. 25.

The district court in this case granted Abou-Haidar's petition for return. The court concluded that Sanin Vazquez retained the child when she informed her husband of her

Superior Court complaint on May 7, 2019, or at the latest when Abou-Haidar filed his answer and counterclaim in D.C. Superior Court on May 23, 2019. J.A. 172. The court also found that the child's habitual residence was France. J.A. 179. On appeal, Sanin Vazquez challenges the district court's findings only with respect to the first two questions. Regarding the first question, Sanin Vazquez takes issue with the district court's retention-date determination. Regarding the second question, Sanin Vazquez and Abou-Haidar agree on the legal standard that should apply—despite some international and circuit-court conflict on the matter. Sanin Vazquez argues only that the parties intended to abandon France when they moved to Washington, D.C.

As for the third question, Sanin Vazquez belatedly attempts to argue that she does "not agree that [Abou-Haidar's] custodial rights under French law were or would be violated by any of her actions or statements." Reply Br. 9-10. But she forfeited that argument by not disputing in the district court "whether, if [the child was] wrongfully retained, Petitioner's custody rights under French law would be violated," J.A. 171. Indeed, Sanin Vazquez's counsel affirmed to the district court that Abou-Haidar had custody rights and that Sanin Vazquez was raising arguments only under the first two questions, J.A. 650-51. In any case, the unrefuted Affidavit of French Law Abou-Haidar submitted to the district court independently supports the conclusion that an order granting Sanin Vazquez's Superior Court complaint unilaterally seeking "primary physical custody" would diminish Abou-Haidar's custodial rights under French law. That Affidavit explains that, "[u]nder French law, both parents have joint rights of custody," and that the "breakdown of a marriage or a relationship has no impact over the rules governing the exercise of parental authority." J.A. 89-92; *see also* J.A. 102 (reproducing relevant sections of the French Civil Code); Hague Convention, art. 5(a) (defining

"rights of custody" broadly to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence"). And, with respect to the fourth question, the district court found that the parties do not contest whether the "Petitioner was exercising his custody rights at the time of wrongful retention." J.A. 171. Our analysis therefore addresses only the first two questions, concluding that the district court did not err in finding that Sanin Vazquez retained the child in May 2019 and that the child's habitual residence was France.

**III.**

Sanin Vazquez's primary contention is that the petition must be dismissed because the district court's retention date of May 7, 2019, precedes December 31, 2019, the date through which the parties agreed the child would remain in the United States. Sanin Vazquez views this concern as jurisdictional, arguing that the dispute "is not ripe until January 1, 2020 passes." Sanin Vazquez Br. 34. In her view, recognizing a retention date prior to December 31, 2019, would constitute an "anticipatory retention"—a type of claim that, she asserts, American courts have never previously recognized. *Id.* at 26-27.

We do not embrace Sanin Vazquez's effort to label her argument in jurisdictional terms; at bottom, her argument is simply about whether a retention occurred, and thus goes to the merits of Abou-Haidar's Hague Convention petition. In any event, we do not believe that the district court reached out to decide an unripe issue when it identified a retention of the child as of May 7, 2019—or, at the latest, May 23, 2019—because this case involves an actual, rather than anticipatory, retention. *See* U.S. Amicus Br. 25-29 (agreeing that this case involves an actual retention). No court has held that either of these

retention dates would be premature. The circuits identify the date of retention as "the date consent was revoked" or when the "petitioning parent learned the true nature of the situation." *Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019). For example, the Second Circuit has held that the date of retention is the date when the retaining parent advised the other that "she would not be returning with the [c]hildren" as originally planned. *Marks ex rel. S.M. v. Hochhauser*, 876 F.3d 416, 422 (2d Cir. 2017). Similarly, the Third Circuit identifies the retention date as the "date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017). These cases also find support in the official commentary of the Convention. *See* Pérez-Vera Report ¶ 108 (stating that the date of retention is when a "holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence").

The circuits also agree that the parental actions that serve to identify such date need not be particularly formal. The withdrawal of consent to existing custody arrangements may be communicated through an in-person conversation, *Darin v. Olivero-Huffman*, 746 F.3d 1, 10 (1st Cir. 2014), or an email, *Marks*, 876 F.3d at 417-18, or a phone call, *Palencia*, 921 F.3d at 1337. More formal actions would also certainly qualify, including unilaterally filing for custody, *Mozes*, 239 F.3d at 1070, or filing a petition under the Hague Convention for the child's return, *Blackledge*, 866 F.3d at 179.

Guided by these analyses, the district court correctly found that Sanin Vazquez retained the child at the earliest on May 7, 2019, when she informed Abou-Haidar of her Superior Court

filing seeking "primary physical custody," J.A. 915, or at the latest by May 23, 2019, when Abou-Haidar filed his answer and counterclaim making clear that he opposed the proposed change to his custody rights, J.A. 152 n.1, 172-73. If there were any doubt as to the precise date, other events further support the district court's conclusion that, by the end of May 2019, both parents understood they disputed the exercise of custody over the child: Sanin Vazquez informed Abou-Haidar on May 10 that she did not intend to return the child to France at the end of the year, J.A. 170; Sanin Vazquez's counsel wrote a letter to Abou-Haidar on May 31 reiterating that Abou-Haidar was not welcome in the Washington apartment where the child was living with her mother, J.A. 1296; and, on June 10, Abou-Haidar filed his petition for the child's return to France, J.A. 10-32. Given the temporal concentration of these events and the lack of any material effect on the analysis of choosing one date over another, we need not isolate one definitive act of retention. Under any circuit's existing law on the point, one or more of these actions suffices to identify a retention. *See generally Redmond*, 724 F.3d at 739 n.5 (noting that an "'abduction' might have occurred on one of several dates; the question is always whether there was *any* date on which a wrongful removal or retention occurred").

These facts also distinguish the case before us from the case on which Sanin Vazquez principally relies, *Toren v. Toren*, 191 F.3d 23 (1st Cir. 1999). The terms of the Toren parents' divorce called for the children to live with their mother in the United States for a few years, with visitation by the father, and provided that, by July 21, 2000, the children would return to Israel where their father lived and attend school there. *See id.* at 25. The mother filed a family-court action in Massachusetts in 1997 to alter the terms of the father's visitation, and the father responded by filing a Hague petition asserting wrongful retention. *See id.* at 27. The court held that

the petitioner had "failed to allege facts sufficient to set forth a claim that the Toren children have been removed or retained within the meaning of the Hague Convention" because the mother had nowhere suggested that she would not return the children to Israel in 2000 as agreed. *Id*. at 27-29. The father pointed only to vague future "intention[s]" on the part of the mother to retain the children. *Id.* at 27. Here, in contrast, a series of decisions and corresponding actions already taken by both parties clearly conveys a ripe disagreement about where the child's custody will lie. As Abou-Haidar observes, the First Circuit's dismissal in *Toren* is therefore consistent with the basic principle that, in order to be ripe, a challenge to an "anticipatory retention requires a clear communication that the retaining parent is not returning the child home." Abou-Haidar Br. 32.

The thrust of Sanin Vazquez's argument is not that the district court misapplied these tests in identifying the date of retention, but that no retention is possible before the date through which the parties initially agreed that the child would reside in the United States. There is some intuitive logic to the notion that, when the parents agreed that the child would remain in a certain place until a specified date, no retention occurs before that date as long as the child remains there. The fundamental flaw with this theory is that Sanin Vazquez's unilateral actions to assert custody amounted to a declaration that she then rejected and sought to depart from the previous mutual arrangement. Courts routinely apply the same analysis to determine whether a retention occurred even when the actions evidencing retention precede the anticipated end date of the parents' prior agreement. *See, e.g.*, *Blackledge*, 866 F.3d at 178-79; *Darin*, 746 F.3d at 10-11. Indeed, in the leading case of *Mozes* itself, the court held that the mother "retained" the children in the United States during a period when the parents had agreed the children would live with her

here and before the date they had set for the family to reunite at home in Israel. *See Mozes*, 239 F.3d at 1069-70 & n.5. Summarizing the case law on retention in such circumstances, *Palencia* aptly observed that "[i]n each of these cases," just as in this one, the "petitioning and non-custodial parent initially assented to the child's removal from the country of habitual residence." 921 F.3d at 1342. Once the parties have made clear that they no longer agree where the child should reside—and especially when, as here, an effort has been made to change the custodial status quo—their prior agreement is no longer adequate to protect custodial forum rights.

Recognizing these authorities, Sanin Vazquez's reply brief pivots to a second variant of her unripeness theory. She acknowledges that courts "may properly find that the date on which a retention becomes wrongful [in a given jurisdiction] can be prior to the date that both parties agreed a child can reside in [that] jurisdiction." Reply Br. 3. Instead, she objects that Abou-Haidar filed his petition immediately after the retention, rather than waiting for the agreed-upon period for the family's stay in Washington to elapse. In her view, the petition here is unusual because, "[i]n all of the cases cited by Dr. Abou-Haidar, the [Hague Convention petition] was filed and/or the evidentiary hearing took place *after* the date that neither party disputed the child could remain in the U.S., not months prior to that date." *Id.*; *see also* Sanin Vazquez Br. 40 ("[N]one of the authority relied on by Dr. Abou-Haidar in the District Court contained factual scenarios which include petitions for return filed in respective district courts prior to the date of agreed-upon return.").

We cannot credit that contention. As a descriptive matter, it is simply incorrect. In at least two of the cases that Abou-Haidar cites, the petition was filed before the end of an agreed-upon sojourn. *See Mozes*, 239 F.3d at 1069; *Blackledge*, 866

F.3d at 175. And while the limits of anticipatory retention claims may be difficult to pin down in the abstract, we have no trouble concluding that this case involves an actual, not anticipatory, retention. At this point, the only practical consequence of Sanin Vazquez's revised contention is that Abou-Haidar would have to refile his petition in a few days, after December 31, 2019, when Sanin Vazquez's initial contract with the Bank expires. Given the live dispute that already exists between the parties and the Convention's command of prompt decisionmaking, delaying and duplicating proceedings in this manner would serve no tangible benefit. Whatever the precise contours of anticipatory retention, here we are not resolving a hypothetical controversy.

## IV.

Having resolved the heart of Sanin Vazquez's claim, we now turn to her abbreviated challenge to the district court's conclusion of the second question. This question asks: "Immediately prior to the removal or retention, in which state was the child habitually resident?" *Mozes*, 239 F.3d at 1070. Here the district court concluded, based on detailed factfinding, that France is the child's habitual residence. Sanin Vazquez contends on appeal that the "factual findings made by the District Court, when applied to the law of and interpreting the Convention, could not possibly yield a ruling that habitual residence was still France." Sanin Vazquez Br. 45.

A preliminary question is what framework we should apply to determine the child's habitual residence. All the circuits to have addressed the question agree that two important considerations are: (1) the parents' shared intent for where the child should reside, and (2) the child's acclimatization to a particular place. *See, e.g.*, *Redmond*, 724 F.3d at 746 ("In substance, all circuits—ours included—consider *both* parental

intent *and* the child's acclimatization."). To the extent the circuits' approaches diverge, they "differ[] only in their emphasis." *Id.* Under the prevailing approach, again represented by *Mozes*, the primary focus is on the parent's shared intent. 239 F.3d at 1078-79. After ascertaining shared intent, the court also considers acclimatization, but a child's acclimatization to a new place of residence overcomes contrary parental intent only where the court "can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'" *Id.* at 1081 (quoting Pérez-Vera Report ¶ 11). The Sixth Circuit, and to some extent the Third Circuit, place primary emphasis on the child's acclimatization, treating shared parental intent as a "back-up inquiry for children too young or too disabled to become acclimatized." *Taglieri v. Monasky*, 907 F.3d 404, 407 (6th Cir. 2018) (en banc), *cert. granted*, 139 S. Ct. 2691 (June 10, 2019) (No. 18-935); *see also Ahmed v. Ahmed*, 867 F.3d 682, 688 (6th Cir. 2017); *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004); *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995).

These differing emphases affect the framing of the standard of review on appeal. Under *Mozes*, the habitual-residence determination is a "mixed question of law and fact." 239 F.3d at 1073. The factual ingredients of the inquiry, *i.e.*, those "founded on the application of the fact-finding tribunal's experience with the mainsprings of human conduct," are reviewed for clear error, while legal aspects of the question, *i.e.*, those that require "judgment about the values that animate legal principles," are reviewed de novo. *Id.* (internal quotation marks and citations omitted). The Sixth Circuit does not identify any legal overlay subject to de novo review, so treats

the habitual-residence determination as purely a "question of fact subject to clear-error review." *Monasky*, 907 F.3d at 409.

We have no occasion to decide as a legal matter which of these frameworks is correct because the parties agreed both here and in the district court to application of the *Mozes* framework. *See* Resp't's Proposed Findings of Fact and Conclusions of Law 16-17 (J.A. 126-27); Pet'r's Proposed Findings of Fact and Conclusions of Law 12 (J.A. 141); Sanin Vazquez Br. 43-45; Abou-Haidar Br. 33. In its amicus brief, the government urges us instead to adopt a new standard, in which "a child's habitual residence under the Convention is a factual inquiry that must take into account all relevant circumstances in each case bearing on the ultimate question of where the child usually or customarily lives." U.S. Amicus Br. 13. Under that relatively unguided, totality-of-the-circumstances approach, "both parental intent and acclimatization can be relevant," but "ultimately any determination of a child's habitual residence must 'remain[] essentially fact-bound, practical, and unencumbered with rigid rules, formulas, or presumptions.'" *Id.* at 20-21 (quoting *Redmond*, 724 F.3d at 746). Again, given both parents' advocacy of the *Mozes* framework, and the importance of settling Convention disputes expeditiously, we see no basis to adopt a new standard different from the one the parties requested and briefed here and in the district court. In any event, neither party has identified any relevant facts not considered by the district court.[4]

---

[4] The Supreme Court will soon clarify the appropriate standard for habitual-residence determinations. *See Monasky v. Taglieri*, No. 18-935 (argued Dec. 11, 2019). The United States there advanced the same standard it puts forth here. Even were we to proceed to apply the government's preferred standard, given the particular facts of this

In line with the *Mozes* framework, we first examine the district court's findings regarding the parents' shared intent, and then its findings regarding the child's acclimatization.

**A.**

The district court found, and Sanin Vazquez concedes, that France was the family's habitual residence before they came to Washington, D.C. *See* J.A. 178; Sanin Vazquez Br. 45 (denying that the family's habitual residence was "still France" after the move). Under *Mozes*, a determination that shared parental intent has changed requires a finding that the parties had a "settled purpose" to establish a new habitual residence. 239 F.3d at 1074. Courts look at a variety of factors to determine whether the parents had a shared intent to change the child's habitual residence, including "parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence."

case, the outcome would not be different. The circuit precedent to which the government points as exemplifying its approach recognizes that shared parental intent "may be a very important fact in some cases," notably in cases, like this one, where "both parents have the right to fix the child's place of residence." *Redmond*, 724 F.3d at 744, 746-47. Moreover, the district court also considered the child's degree of acclimatization, and ultimately based its decision on a variety of facts, *see* J.A. 181-82, including those the United States identifies as relevant to the habitual residence inquiry, *see* U.S. Amicus Br. 21. We therefore do not see the district court as running afoul of *Redmond*'s caution that shared parental intent should not be taken as a "rigid" or "uniformly applicable 'test' for determining habitual residence." 724 F.3d at 744.

*Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009). Courts have held parents cannot establish a new habitual residence without forsaking their existing one. A "person cannot acquire a new habitual residence without 'forming a settled intention to abandon the one left behind.'" *Darin*, 746 F.3d at 11 (quoting *Mozes*, 239 F.3d at 1075).

Crucially, *Mozes* tells us that "[w]hether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court." 239 F.3d at 1075-76. Here, the district court canvassed all of the record evidence and found that the parties intended to remain in Washington, D.C. for the eighteen months of Sanin Vazquez's initial contract, but that any plans to stay beyond that period were "aspirational and contingent." J.A. 178. Looking at a variety of factors, the court concluded that the "parties did not leave France in a manner that would suggest a shared intent to relocate indefinitely to the United States." J.A. 153; *see also* J.A. 179. The district court's detailed, record-based factual findings fully support that determination. The court found that the couple kept their French jobs and stored their personal belongings in France, Sanin Vazquez maintained her French pension, and the couple did not have any going-away party or other social event such as one might expect had they intended a permanent departure from France. J.A. 179. Moreover, the couple and their daughter—all of whom were EU citizens with rights to remain in France indefinitely—had no prior connection to the United States, obtained only temporary visas to live here, and rented rather than bought property in Washington, D.C. J.A. 179-80 & n.4. Finally, Abou-Haidar continued to spend nearly half of each month living and working in France and made no effort or plans to obtain an American medical license. J.A. 179.

23

On appeal, Sanin Vazquez has not articulated why any of these factual findings is clearly erroneous. She highlights several other facts relevant to an intent to shift the family's habitual residence to the United States, including the parties' initial attempt to buy a home in Washington, the fact that they rented out their Barcelona apartment for a three-year term, and a series of text messages from Abou-Haidar referring to the possibility of a stay of up to three years in the United States. J.A. 55, 64-68, 248-49, 278, 282, 320. But the district court took those facts into account. It determined that the parties considered buying a home in Washington primarily as an investment, *see* J.A. 179 n.4, and reasonably rejected Sanin Vazquez's contention that her renegotiated Bank contract would automatically renew after 18 months to create a default three-year stay in Washington, *see* J.A. 167. Sanin Vazquez also claims that the district court erred in crediting Abou-Haidar's testimony and the corroborating testimony of his friends, rather than the testimony of her friends and family, as to the parties' stated intentions upon departure from France. Sanin Vazquez Br. 45-46. But our review is at its most deferential when it comes to reexamining the district court's credibility determinations. *See, e.g.*, *Maxwell*, 588 F.3d at 253.

To the extent that Sanin Vazquez suggests that the district court made a mistake of law, her primary argument is that the district court "erroneously imposed a requirement that the parties supplant the former habitual residence of Paris with Washington, D.C., in order to effectively abandon Paris." Sanin Vazquez Br. 44. Sanin Vazquez herself does not take a consistent position in her briefing as to whether she believes the family has simply abandoned France, *id.* at 43, abandoned France in favor of habitual residence in the United States, *id.* at 45, or abandoned France en route to establishing habitual residence in Uruguay, *id.* at 44. *Mozes* recognizes a conceptual difference between abandoning a habitual residence and

establishing a new one: a person can abandon a habitual residence "in a single day if he or she leaves it with a settled intention not to return to it," but an "appreciable period of time and a settled intention will be necessary to enable him or her to become" habitually resident in a new country. *Mozes*, 239 F.3d at 1074-75 (internal quotation marks and citation omitted). The district court explicitly acknowledged this conceptual difference, and held only that the parents did *not* have a settled intention to abandon France, regardless of their intentions with respect to Washington, D.C. J.A. 154 n.3. The district court's factual finding of the absence of settled intention to abandon France suffices to support its habitual-residence holding. We see no legal error in its analysis of the point.[5]

## B.

The second inquiry, subsidiary under the parties' stipulated *Mozes* framework, is the child's acclimatization to the new country. "Evidence of acclimatization is not enough to establish a child's habitual residence in a new country when contrary parental intent exists." *Darin*, 746 F.3d at 12 (citing *Mozes*, 239 F.3d at 1078-79). *Mozes* further counsels that courts should "be slow to infer from [a child's contacts] that an earlier habitual residence has been abandoned" in the absence

---

[5] Sanin Vazquez also mentions the French Central Authority's rejection of Abou-Haidar's request for its assistance. *See* Sanin Vazquez Br. 12-13. We agree with the United States that no deference to that action is due because the Convention assigns the legal and factual determinations relevant to a claim of wrongful retention (or removal) to the courts of the Contracting States, not to the Central Authorities. *See* Special Commission on the Practical Operation of the 1980 and 1996 Hague Conventions, *Conclusions and Recommendations* 2 (¶ 13) (June 1-10, 2011), https://assets.hcch.net/upload/wop/concl28sc6_e.pdf; U.S. Amicus Br. 29-33.

of shared parental intent to do so. 239 F.3d at 1079. Courts view a variety of factors as relevant to acclimatization, including "school enrollment, participation in social activities, the length of stay in the relative countries, and the child's age." *Maxwell*, 588 F.3d at 254.

Here, Sanin Vazquez has not identified any error in the district court's findings regarding the child's acclimatization. The district court recognized that the child had adjusted to a new school, made friends, and participated in extracurricular activities in the ten months she spent in the United States prior to the retention in May 2019. J.A. 182. But, until the sojourn in Washington, the child's life was based almost entirely in Paris: her parents married there, she was born there, and she attended nursery school there.

Sanin Vazquez has not argued that the district court committed any legal error in applying the *Mozes* framework to its findings relating to the parents' shared intentions and the child's acclimatization. She does not urge us to adopt any other court's approach (nor the approach the government describes). And she does not argue that any of the district court's factual findings, including its findings supporting its shared parental intent determination, were clearly erroneous. In these circumstances, the district court reasonably determined that "[e]vidence of acclimatization over such a short period of time for such a young child is not enough to overcome the parties' lack of intent to abandon France," or any of the other factual indicia showing that France was their daughter's habitual residence. J.A. 182.

\* \* \*

We conclude that Sanin Vazquez's arguments regarding the date of retention and the child's habitual residence lack merit. Because the parties chose the *Mozes* framework, and

Sanin Vazquez has not challenged the district court's findings under the remaining questions or asserted any defenses, we affirm the district court's judgment granting Abou-Haidar's petition for return.

*So ordered*.