In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-3407

ASLI BAZ,

*Petitioner-Appellee,*

*v.*

ANTHONY PATTERSON,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:23-cv-05017 — **Jorge L. Alonso**, *Judge.*

ARGUED APRIL 11, 2024 — DECIDED APRIL 30, 2024

Before WOOD, HAMILTON, and LEE, *Circuit Judges.*

WOOD, *Circuit Judge.* Asli Baz, a citizen of Germany, filed this suit under the International Child Abduction Remedies Act, Pub. L. No. 100-300, 102 Stat. 437 ("ICARA"), seeking to compel Anthony Patterson, a citizen of the United States, to return their six-year-old son, A.P., from Illinois to Germany. ICARA implements the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S., No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980) ("the Convention"), an

international treaty to which both the United States and Germany are parties. The statute "entitles a person whose child has been wrongfully [retained in] the United States in violation of the [] Convention to sue the wrongdoer in federal court for the return of the child" to the child's habitual residence. *Altamiranda Vale v. Avila*, 538 F.3d 581, 583 (7th Cir. 2008) (citing 22 U.S.C. § 9003(b)).[1]

The district court found that A.P.'s habitual residence at the time he was retained was in Germany, where he had lived with Baz for over a year, and that the retention in Illinois violated Baz's rights of custody under German law. It thus granted Baz's petition and ordered the child's return. We stayed the district court's return order while Patterson appealed the judgment. In his appeal, Patterson challenges both the jurisdiction of the district court and its rulings on the merits of the petition. We conclude that the district court properly exercised the jurisdiction granted to it by ICARA and that the record supports its decision. We therefore affirm.

**I**

In 2013, Baz was living in the United Kingdom and Patterson resided in Florida. The two met while Baz was visiting Miami, and they soon struck up a relationship. Two years later, Baz moved to Chicago on a student visa to pursue a doctoral degree in clinical psychology. Patterson accompanied her, they moved into a house together, and their son, A.P., was born in May 2017. Although Baz and Patterson ended their relationship shortly after A.P.'s birth, they continued to

---

[1] In 2014, the codified legislation was transferred from Title 42 of the United States Code to Title 22. Our references here are to the 2018 edition of the Code.

occupy the same house, though on different floors, pursuant to an order from the Circuit Court of Cook County, Illinois ("Illinois state court"). In November 2017, Patterson committed a domestic battery against Baz, for which he was charged, convicted, and sentenced to eighteen months of conditional discharge. He has fully served that sentence.

Over the next few years, Baz and Patterson continued to rely on the Illinois state court to resolve issues relating to A.P.'s custody and placement. On August 5, 2019, Baz sought and received the court's permission to relocate with A.P. to Wisconsin for her pre-doctoral internship. In September 2020, Baz again requested permission to relocate with A.P., this time to Minnesota so that she could complete a mandatory pre-doctoral fellowship in forensic psychology. The Illinois state court granted this request, too, and Baz completed her fellowship in March 2021.

Baz's student visa would have expired when her fellowship concluded, but it had been extended six months to March 2022 because of regulatory changes implemented during the COVID-19 pandemic. A sixty-day grace period allowed Baz to stay in the United States until May 21, 2022. As that date approached, Baz exhaustively pursued ways to remain in the country. She applied for and was offered a position as a forensic psychologist in Cincinnati, Ohio, but her petition in the H-1B lottery was unsuccessful. She entered the green-card lottery, but she was not selected for a visa. And she hired an immigration lawyer who helped her to apply for an EB-2 visa, but this effort was also unsuccessful.

Anticipating that she would need to leave the United States in May 2022, Baz sought permission from the Illinois state court to relocate with A.P. to Germany. Patterson

objected to her request, and the guardian *ad litem*, Michael Bender, recommended that the court deny it. The Illinois state court held a trial on Baz's relocation motion and, on May 9, 2022, granted her petition. The court then instructed Baz and Patterson to draft an agreement detailing how they would divide their parenting time and decision-making responsibilities after Baz relocated.

The Illinois state court memorialized the parental agreement on May 23, 2022, in a document entitled "Allocation Judgment: Allocation of Parenting Responsibilities and Parenting Plan" ("Illinois Allocation Judgment"). The Illinois Allocation Judgment was signed by Baz, Patterson, and the presiding judge, but not by the guardian *ad litem*. It provided that A.P. would move with Baz to Germany, where he would attend school, with each parent paying half of his tuition. The agreement also stated that A.P. would continue with his primary health-care provider in the United States, but that Baz would be responsible for securing medical, health, and hospitalization insurance for him in Germany, at least through the first month following his eighteenth birthday.

Although A.P. was to spend much of his time in Germany, the Illinois Allocation Judgment provided that Patterson would have parenting time during the summer and other school breaks. He also was allowed to have daily video calls with A.P. and to visit him in Germany. The parents agreed that each of them would maintain possession of A.P.'s U.S. passport during his or her respective parenting time, and that they would exchange the passport whenever A.P. was dropped off or picked up. The parties were allowed to modify this parenting schedule by written agreement.

The Illinois Allocation Judgment also purported to determine A.P.'s habitual residence for purposes of the Convention. (As we elaborate below, a child's habitual residence matters to the Convention because a retention cannot be wrongful unless, among other requirements, "it is in breach of rights of custody attributed to a person … under the law of the State in which the child was habitually resident immediately before the … retention." Convention, art. 3.) The habitual-residence provision of the Illinois Allocation Judgment states that "[t]he 'Habitual Residence' of the minor child is the United States of America, specifically the County of Cook, State of Illinois, United States of America." Another provision provides that neither Baz nor Patterson had "consented, or acquiesced to the permanent removal of the child to or retention in any country other than the United States of America." The agreement also includes a jurisdictional provision, which states that "[s]o long as at least one parent resides in the State of Illinois, the Circuit Court of the State of Illinois shall retain exclusive and continuing jurisdiction over this cause to enforce or modify the terms and provisions of this Allocation Judgment." Although the Illinois Allocation Judgment stated that Baz would continue to apply for temporary and permanent visas that would allow her to travel to the United States, it did not impose a time limit on her efforts, nor did it state that Baz's and A.P.'s move would be temporary or provide a date that the agreement would expire.

By early May 2022, Baz had sold or donated all of her belongings in the United States. On May 13, 2022, with the permission of the Illinois state court, she and A.P. relocated to Germany. A.P. at the time was about five years old. Shortly after they arrived, Baz acquired a German passport for A.P., who, like her, is a German citizen. (To be accurate, A.P. has

dual U.S. and German citizenship.) Baz testified that she applied for the passport because under German law A.P. could not attend school or enroll in the national health-care system without identification.

After Baz and A.P. relocated to Germany, A.P. enrolled in school as planned. He attended kindergarten at the International School on the Rhine in Düsseldorf from August 2022 through December 2022. He then transferred to the Johanniter Kindergarten in Erkrath, Germany (where Baz now lives), which he attended from January 2023 until July 2023. A.P. was scheduled to begin first grade on August 8, 2023, at the Regenbogen Grundschule (in English, the Rainbow Primary School), which also is located in Erkrath. Outside of school, A.P. has taken swim classes, and he has a German pediatrician, dentist, and therapist. Like A.P.'s classes, these extracurriculars are conducted in German. A.P. is fluent in German, English, and Turkish. He also has friends and extended family, including a maternal grandmother, in Germany.

During the year following A.P.'s relocation to Germany, Patterson visited A.P. several times and regularly exercised his parenting time in the United States. Prior to his relocation, A.P. had attended school and participated in extracurricular activities in Chicago during Patterson's parenting time. He has siblings who live in Chicago and extended family elsewhere in the United States.

Patterson's parenting time during one of A.P.'s school breaks ended on January 5, 2023. When he returned A.P. to Germany, however, he did not hand over the child's U.S. passport to Baz. In response, Baz sought the assistance of the German police. When the police failed to secure the passport, she became worried that Patterson planned to take the child

from Germany and to retain him in the United States, and so she filed a lawsuit in German court seeking an order preventing A.P. from being removed from Germany and awarding her sole custody. That court entered interim orders that prohibited A.P.'s removal from Germany, but it did not rule on the custody request. Patterson obtained German counsel to represent him during the proceedings, which he attended virtually.

In March 2023, Patterson filed an "Emergency Motion to Modify Parenting Time and Allocation of Parental Responsibilities and Parenting Time" in Illinois state court. The court continued the proceedings because it did not consider Patterson's motion to be an emergency. A month later, the court ordered Baz to file a supplemental appearance. As of December 2023, she had not done so.

Back in the German court, Baz and Patterson negotiated a settlement agreement and memorialized it in a "German Consent Order" dated May 31, 2023. The settlement was twice dictated and translated before each of the parents approved it. It reaffirmed that joint parental care and custody of A.P. would remain in place, and that the Illinois Allocation Judgment would continue to apply to the extent that additional specifications had not been adopted. The parents further agreed that A.P. was living in Germany with Baz, but that Patterson was authorized and required to have parenting time or contact with A.P. from June 19, 2023, through July 31, 2023, pursuant to the Illinois Allocation Judgment. Once A.P. was back in Germany, Patterson would be allowed to see him at discrete times in August 2023 and to attend the child's first-day-of-school ceremony on August 8, 2023. Patterson would keep

A.P.'s U.S. passport going forward, and Baz would keep his German passport.

Through the German Consent Order, Baz and Patterson also agreed that they would not continue to pursue custody-related matters pertaining to A.P. in either the United States or Germany. Patterson "commit[ted] himself to submit the [German Consent Order] to the [Illinois state] court in Chicago by" June 2, 2023. He also agreed "to request that the American court suspend the proceedings in view of the fact that the German attorneys want to come up with an out-of-court solution." Patterson notified the Illinois state court of the agreement on June 1, 2023, but he did not furnish the court a complete copy of the German Consent Order (either in German or in English).

Immediately after informing the Illinois state court about the German Consent Order, Patterson told Bender (the guardian *ad litem*) that he had agreed to that order under duress.[2] By June 2, 2023, Patterson had also filed a motion with the Illinois state court entitled "Emergency Motion to Modify Parenting Time and Allocation of Parental Responsibilities and Parenting Plan and Petition for Rule to Show Cause and for a Finding of Indirect Civil Contempt." This motion may have

---

[2] Bender testified that Patterson told him he entered into the German Consent Order under duress "[a]lmost immediately" after the agreement was entered. The district court, however, expressly declined to find that Patterson was under duress at that time, noting that Patterson had been "represented by retained counsel, voluntarily participated in the May 31, 2023, settlement proceedings, and presented no evidence that he signed the [German] Consent Order under duress." *Baz v. Patterson*, 2023 WL 8622056, at *3 n.2 (N.D. Ill. Dec. 13, 2023). Patterson has not challenged that finding on appeal.

been the same as (or at least related to) the one Patterson filed in March 2023, but in any event he appears to have continued to pursue this request despite his agreement in the German Consent Order to ask that the Illinois state court proceedings be suspended pending efforts to resolve the case amicably.

When Baz learned that Patterson was acting contrary to the German Consent Order, she expected that he would also refuse to return A.P. to Germany by July 31, 2023, when his summer parenting time was up. Motivated by this concern, Baz did not make plans for A.P. to return to the United States on June 19, 2023. This conflicted with the German Consent Order.

On June 27, 2023, the Illinois state court ruled on a separate motion filed by Patterson, this one entitled "Emergency Motion to Enforce the May 23, 2022 Court Order and to Modify Parental Responsibilities and Parenting Plan." The court found that Baz had not turned A.P. over to Patterson on June 1, 2023, as the Illinois Allocation Judgment had required. (The German Consent Order had modified the exchange date to June 19, 2023, which also had passed.) It ordered Baz immediately to turn over A.P. to Patterson, and authorized Patterson to travel to Germany to retrieve the child.

On July 3, 2023, Patterson arrived in Germany, went to A.P.'s school, and removed the child from his kindergarten class to bring him to the United States. The kindergarten staff called the German police, who briefly stopped Patterson at the Düsseldorf airport, but ultimately allowed him to leave the country with A.P. because the German Consent Order stated that Patterson's parenting time had begun on June 19, 2023. That same day, Patterson messaged Baz to inform her that he

had A.P. and that he would allow them to talk via FaceTime once they were settled in the United States.

Sometime around July 7, 2023, Patterson filed an "Emergency Ex Parte Petition for Temporary Restraining Order and Preliminary Injunction" with the Illinois state court.[3] He requested that Baz be ordered to return A.P. to Chicago (though A.P. was in Chicago by that time) and sought sole custody. On July 10, 2023, Patterson secured a favorable ruling on his motion. The order stated that, until further order from the court, Baz was "restrained from having physical contact with" A.P. and that Patterson was "granted exclusive parenting time and decision making for the minor child[.]" It further ordered Baz to "deposit any and all foreign identification, passport(s) (including, but not limited to any German passport), or travel document(s)" for A.P. with the court by July 25, 2023.

On July 18, 2023, about a week after the temporary restraining order was entered, Baz filed a Hague Convention Application for Return with the Central Authorities for the United States and Germany, seeking A.P.'s return to Germany. See 22 U.S.C. § 9003. Baz also petitioned the Illinois state court to stay both its temporary restraining order and the custody case. The court declined her request, and on July 25, 2023, it converted its temporary restraining order against Baz into a preliminary injunction that remains in place. Since

---

[3] The district court was not provided with a copy of Patterson's petition, and so it found that the petition was filed around July 7, 2023 (*i.e.*, three days before the Illinois state court ruled on the motion). Neither party contests this finding.

pulling A.P. from his kindergarten class in July 2023, Patterson has not allowed the child to return to Germany.

On August 1, 2023, Baz filed her Verified Petition for Return of Child to Germany in the Northern District of Illinois. The district court held a two-day evidentiary hearing, during which it considered testimony from the parties, two German attorneys, Bender, and Patterson's sister. On December 13, 2023, the court granted Baz's petition. It issued an order the following day requiring that A.P. be returned to Germany. But, after entering final judgment, the district court stayed its return order through January 5, 2024, so that Patterson could in turn seek a stay from us while he appealed the judgment. See FED. R. APP. P. 8. We granted Patterson's request for a stay pending appeal and ordered expedited briefing. The case is now ready for decision.

## II

Before we reach the merits of this appeal, we must address an unusual threshold issue. Patterson insists that the district court should have denied Baz's petition because various provisions in the Illinois Allocation Judgment displace the Convention. A close inspection of Patterson's argument shows that it can be understood in two discrete ways. On the one hand, he states repeatedly that the district court lacked "jurisdiction" over Baz's petition because the Illinois Allocation Judgment confers exclusive jurisdiction on the Illinois state court. These statements suggest to us that Patterson is making a forum-selection argument. On the other hand, Patterson suggests that certain language in the Illinois Allocation Judgment prevents any court but the Circuit Court of Cook County from applying the Convention (and ICARA), which we take to be a choice-of-law argument. As it turns out,

it does not matter which theory Patterson intends to advance. Regardless of whether the jurisdictional provision is understood as a forum-selection clause or a choice-of-law clause, Patterson cannot rely on the Illinois Allocation Judgment to oust federal jurisdiction over a case brought under the Convention.

We begin with the forum-selection theory. A forum-selection clause will not be enforced if it "would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial decision." *Bonny v. Society of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). The Convention is an international treaty that "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). By signing the treaty, the Senate and the President pledged that the United States would "have in place judicial and administrative remedies for the return of children taken from the State of their habitual residence to another signatory State in violation of the left-behind parent's custody rights under the law of the State of the child's habitual residence." *Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013) (citing Convention, arts. 3, 4, 7, 12).

Congress enacted ICARA to implement the Convention for the United States. See 22 U.S.C. § 9001(b). The statute provides that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." *Id.* § 9003(a). By conferring concurrent jurisdiction upon both the state and the federal courts, Congress made a policy judgment about how best to meet the obligations it undertook under the treaty. The

parties have no power to contravene Congress's choices about subject-matter jurisdiction. All they might be able to do would be to select one among several potential venues for suit. That choice cannot be made without reference to the Convention. There is thus nothing in the parties' private forum-selection agreement that either adds to or subtracts from the court's jurisdiction, in the sense of its power to adjudicate the issues the parties have raised.[4]

The choice-of-law theory fails for similar reasons. As the name suggests, choice-of-law clauses affect only the substantive law that will apply to a claim raised under the Convention and ICARA. The possibility that some claims might not be cognizable under the chosen law does not affect the court's jurisdiction. Choice-of-law clauses are generally enforceable, but such a clause would be invalid if it violated United States public policy. See *Seafarers Pension Plan on behalf of Boeing Co. v. Bradway*, 23 F.4th 714, 726 (7th Cir. 2022). Congress, as we have said, enacted ICARA so that a parent of a wrongfully retained or removed child could petition courts in the United States for the return of the child to the child's habitual residence. Faced with such a petition, the court's job is to consult the governing law and decide where the child habitually resides. If that residence is not in the forum state, then the court dismisses as instructed by ICARA and the Convention so that

---

[4] We note that there are provisions in the treaty and ICARA that affect the kinds of claims that can be brought. For example, Congress has required that full faith and credit be accorded to prior judgments of both state and federal courts, see 22 U.S.C. § 9003(g), thereby creating the basis for an affirmative defense in some circumstances. But no judgment pertaining to A.P. has arisen through adjudication of a claim under the Convention, and neither is such a suit pending in another court.

the proper court can decide the delicate issues of residence and custody that these cases present. Those are preliminary procedural decisions, not jurisdictional rulings. As applied here, there was no subject-matter jurisdiction bar preventing Baz from filing her petition for a return order in the federal court, notwithstanding the language in the Illinois Allocation Judgment purporting to give "exclusive and continuing jurisdiction" over the case to the Circuit Court of the State of Illinois. Upon Patterson's motion, the federal court simply had to decide what weight to give that choice-of-forum (or law) provision under the Convention.

## III

With this jurisdictional detour out of the way, we are ready to address Baz's return petition. In their briefs and at oral argument, the parties at times seemed to mistake this case for a custody proceeding. But "[a] Hague Convention case is not a child custody dispute." *Redmond*, 724 F.3d at 737 (quotation omitted); see also 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."). Rather, the purpose of a Convention case is to determine whether a child has been wrongfully removed or retained from his habitual residence and, if so, to order the child's prompt return. See *Redmond*, 724 F.3d at 737. As the Supreme Court explained in a decision that takes center stage in this dispute, "[t]he Convention's return requirement is a provisional remedy that fixes the forum for custody proceedings." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quotation omitted). Underlying the return requirement "is the Convention's core premise that 'the interests of children … in matters relating to their custody' are best

served when custody decisions are made in the child's country of 'habitual residence.'" *Id.* (quoting Convention Preamble).

Thus, far from weighing in on a custody dispute, all that we must decide is whether Baz has shown by a preponderance of the evidence that A.P. was wrongfully retained away from his habitual residence. See 22 U.S.C. § 9003(e)(1). To do so, we apply a familiar four-part inquiry:

> (1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?

*Redmond*, 724 F.3d at 737–38. We address these four questions sequentially.

## A. Time of Retention

Baz alleges that Patterson wrongfully retained (as opposed to removed) A.P., and so "[t]he first question is … when the retention began." *Walker v. Walker*, 701 F.3d 1110, 1118 (7th Cir. 2012). "Wrongful retentions typically occur when a parent takes a child abroad promising to return with the child and then reneges on that promise." *Redmond*, 724 F.3d at 738 n.5. The date on which a wrongful retention commenced is a question of fact on which we defer to the district court. See *Walker*, 701 F.3d at 1118.

The district court identified July 7, 2023, as the date of A.P.'s retention. Patterson had returned to the United States

with A.P. on July 3, 2023, and by July 10, 2023, he had requested a temporary restraining order and exclusive parenting time and decision-making authority. The district court understood Patterson's actions as an indication of his refusal to abide by the German Consent Order and of an intent not to return A.P. to Germany when his summer parenting time ended on July 31, 2023. It concluded that the retention occurred on July 7, 2023, because that was "'the date consent was revoked' or 'when the petitioning parent learned the true nature of the situation.'" *Baz v. Patterson*, 2023 WL 8622056, at * 5 (N.D. Ill. Dec. 13, 2023) (quoting *Abou-Haidar v. Sanin Vazquez*, 945 F.3d 1208, 1216 (D.C. Cir. 2019), *abrogated on other grounds by Monasky*, 589 U.S. 68).

The record amply supports the district court's finding. When he agreed to the German Consent Order, Patterson made affirmative representations regarding the date on which he would return A.P. to Germany. He then turned around and sought sole custody of A.P. notwithstanding his commitment in the German Consent Order not to pursue further custody-related matters pending efforts to resolve their dispute out of court. Baz could reasonably infer from Patterson's decision to renege on that commitment that he also would not be returning A.P. to Germany as they had agreed. *Cf. Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019) (holding that "the date the petitioning parent learned the true nature of the situation" is the date of wrongful retention). The district court did not clearly err by identifying July 7, 2023, as the date of retention.

## B. Habitual Residence Prior to Retention

Our next task is to ascertain A.P.'s "habitual residence 'immediately before' the alleged … retention." *Redmond*, 724 F.3d at 738 n.5 (quoting Convention, art. 3). As we noted in

*Redmond*, "[t]he Convention does not define the term 'habitual residence.'" *Id.* at 742. But the Supreme Court's recent decision in *Monasky* sheds light on the meaning of that term. See 589 U.S. 68. In *Monasky*, the Court expressly rejected the view "that habitual residence depends on an actual agreement between a child's parents." *Id.* at 77. Instead, "[t]he place where a child is at home, at the time of … retention, ranks as the child's habitual residence." *Id.*

Determining where a child was at home at the time of retention is a "fact-driven inquiry," "not a categorical one." *Id.* at 78, 77. The inquiry "must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Id.* at 78 (quoting *Redmond*, 724 F.3d at 744). Among the factors to consider are "facts indicating acclimatization," which "will be highly relevant," and "the intentions and circumstances of caregiving parents." *Id.* at 78. But "[n]o single fact … is dispositive across all cases," and so courts must consider "the totality of the circumstances specific to the case" to determine a child's habitual residence. *Id.* at 78, 71.

*Monasky* also announced the standard that an appellate court must apply when reviewing a district court's habitual-residence determination. The Court concluded that the inquiry presents a mixed question of law and fact because a district court must first "correctly identif[y] the governing totality-of-the-circumstances standard." *Id.* at 84. Once a district court has identified the appropriate standard, "what remains for the court to do in applying that standard … is to answer a factual question: Was the child at home in the particular country at issue?" *Id.* Thus, so long as a district court applies the correct legal standard, its habitual-residence

determination "should be judged on appeal by a clear-error review standard deferential to the factfinding court." *Id.*

1.

Here, the district court applied the totality-of-the-circumstances standard to determine where A.P. was at home on July 7, 2023. Patterson argues, however, that the totality-of-the-circumstances standard does not apply. In his view, the habitual-residence clause of the Illinois Allocation Judgment, which states that A.P.'s habitual residence for purposes of the Convention is Cook County, should have been conclusive upon the court. Baz conceded in her petition that this provision purported to determine the child's future habitual residence, and so we can take the meaning of the provision as established. The critical question that Patterson raises is whether a parental stipulation as to their child's future habitual residence conclusively establishes residence, or if instead it is simply a factor (albeit a powerful one) for the totality-of-the-circumstances test. We conclude that it can be only the latter.

Patterson's theory suffers from two fatal flaws. First, it rests on the fallacy that Baz's and Patterson's stipulation can bind third parties (such as A.P.'s guardian *ad litem*, who was not a party to the Illinois Allocation Judgment) or the district court. Patterson has directed us to no Convention case in which a court concluded that either it or a non-party was bound by a parental stipulation about the *future* habitual residence of a child, and neither are we aware of such a case. To the contrary, the courts that have confronted arguments of the kind that Patterson presses have found them unpersuasive. See, *e.g.*, *Karkkainen v. Kovalchuk*, 445 F.3d 280, 292–93 (3d Cir. 2006) (concluding that a habitual-residence stipulation was no

longer binding because the child's circumstances had changed since the agreement was made).

In other contexts, we have refused to allow stipulations between the parties to bind third parties or to dictate the district court's factual determinations. As we noted in *United States v. Barnes*, a sentencing case, "[g]enerally, stipulations are not binding on the fact-finder." 602 F.3d 790, 796 (7th Cir. 2010) (citing *Analytical Engineering, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443 (7th Cir. 2005)). In that case, we observed that a stipulation is merely "a contract between two parties to agree that a certain fact is true" and thus could not "bind a third party— the district court judge—without his consent as well." *Id.* Various treatises likewise take the position that stipulations cannot bind third parties without their consent. See, *e.g.*, 83 C.J.S. Stipulations § 53 (2024) (noting that "[p]arties cannot by stipulation affect any rights but their own" and that "there is no binding effect on parties to the action who do not join in the stipulation, especially when the rights of those not made parties involve a matter of public interest"); 73 AM. JUR. 2d Stipulations § 8 (2024) ("[I]t is recognized that a stipulation is not binding upon those who are not parties either to the stipulation or to the action or proceeding in which it is entered into."). We decline to carve out from that general rule an exception for habitual-residence determinations in Convention cases.

The second flaw in Patterson's theory is that it assumes that parental intent alone can dictate a child's habitual residence. That assumption is mistaken. Courts have long recognized that the Convention has as its central goal the best interests of the child, and so the child's perspective is relevant to determining his habitual residence. See, *e.g.*, *Feder v. Evans-*

*Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (explaining that a determination of habitual residence "*must focus on the child* and consists of an analysis of the child's circumstances in that place *and* the parents' present, shared intentions" (emphases added)); *Barzilay v. Barzilay*, 600 F.3d 912, 918 (8th Cir. 2010) (similar). The Supreme Court adopted that view in *Monasky*, where it concluded that "[w]hat makes a child's residence habitual is … some degree of integration by the child in a social and family environment." 589 U.S. at 77 (quotation omitted).

Even before *Monasky*, we had rejected the view that a parental agreement about a child's future habitual residence should be given decisive effect. See *Redmond*, 724 F.3d at 732. The parents in *Redmond* had agreed in 2006 to raise their soon-to-be-born son in Ireland, and the district court had treated this agreement, which was evidence of "the parents' last shared intent[,] as a kind of fixed doctrinal test for determining a child's habitual residence." *Id.* We reversed, concluding that last shared parental intent at the time of the child's birth "shed[] little light on the question of [the child's] habitual residence in 2011." *Id.* Our decision was motivated by the belief that it would be "unwise to set in stone the relative weights of parental intent and the child's acclimatization." *Id.* at 746.

There is little to distinguish the parental agreement in *Redmond* from the stipulation upon which Patterson relies. Both the agreement and the stipulation seek to determine a child's habitual residence *ex ante*, rather than at the time specified in the Convention. Although Baz and Patterson attempted to tie the court's hands in the Illinois Allocation Judgment with respect to the future habitual residence of their child, the district court correctly determined that the

stipulation can be only one factor among others to consider when applying the totality-of-the-circumstances test.

In reaching this conclusion, we do not suggest that the habitual-residence provision of the Illinois Allocation Judgment carries no weight, nor do we imply in any way that either parent was foolish to make such an agreement. A parental stipulation as to their child's future habitual residence will often be powerful evidence of "the intentions and circumstances of caregiving parents," which are "relevant considerations." *Monasky*, 589 U.S. at 78. In other cases, it may be evidence of the last shared parental intent, which we have said "is one fact among others, and indeed may be a very important fact in some cases." *Redmond*, 724 F.3d at 744. Our conclusion does not disturb these principles. But in the end, a child's habitual residence depends not on any one fact, but on the totality of the circumstances specific to the case.

2.

Because the district court applied the correct legal test, we review its finding that Germany was A.P.'s habitual residence at the time of retention only for clear error. For this purpose, Patterson advances two arguments. First, he insists that the district court erred by considering evidence of A.P.'s acclimatization in Germany. In his telling, facts about A.P.'s time in Germany are tainted as evidence of post-abduction acclimatization, because Baz wrongfully removed A.P. to Germany and retained him there.

This argument is a non-starter—and not simply because Patterson has never brought a claim under the Convention. *Cf. Kijowska v. Haines*, 463 F.3d 583, 588–89 (7th Cir. 2006)

(explaining that a father who did not pursue a remedy under the Convention "enabled [the child] to obtain a habitual residence in the country to which her mother took her, even if the initial taking was wrongful"). Patterson agreed to Baz's relocation to Germany with A.P. when he entered into the Illinois Allocation Judgment and again when he signed the German Consent Order. He cannot now claim that an arrangement that he authorized constitutes a wrongful removal or retention of A.P. Patterson resists that conclusion by pointing to evidence in the record that Baz procured permission to return to Germany under false pretenses, namely, by disingenuously telling the Illinois state court that she would continue to pursue lawful immigration status in the United States when she had no actual intent to do so. But the district court evaluated that evidence and (unlike the Illinois state court) did not find it persuasive. This was a credibility determination to which we defer on clear-error review. On the basis of the facts the district court found, it properly considered evidence of A.P.'s acclimatization.

Patterson next argues that, even if the district court did not err in considering A.P.'s acclimatization to Germany, we should still reverse because it did not properly weigh the evidence. Yet the court's habitual-residence determination was based on a close examination of the record and a careful weighing of the circumstances specific to the case. The court acknowledged that significant evidence suggests that A.P.'s habitual residence was Chicago: the Illinois Allocation Judgment expressed the parents' shared intent in May 2022 that Cook County would be A.P.'s habitual residence; the German Consent Order arguably reaffirmed that shared parental intent in May 2023; and A.P. has siblings in Chicago, as well as extended family elsewhere in the United States.

The district court nonetheless concluded that there was more evidence showing that A.P. had acclimated to social life in Germany. The evidence of acclimatization included the following points: A.P. had been attending kindergarten and was set to begin first grade in Germany; he had participated in extracurricular activities in Germany; he spoke German and his schooling, extracurriculars, and medical services were conducted in that language; he had friends and extended family in Germany; he visited the United States only during school breaks; and neither the Illinois Allocation Judgment nor any other evidence indicated that the parents had made plans for A.P. to return permanently to the United States. In the light of these competing factors, we see no clear error in the district court's weighing of the evidence.

We freely concede that another judge considering the same circumstances might have weighed the evidence differently. Even Baz acknowledges in her appellate briefing that some evidence suggests A.P. is at home in Cook County; she goes so far as to suggest that perhaps the court could have made that finding. As we have said, however, appellate courts must review a habitual-residence determination under the deferential clear-error standard. See *Monasky*, 589 U.S. at 84. When applying that standard, we cannot reverse "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985). And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. The district court's finding that A.P. was at home in Germany on July 7, 2023, is plausible, and so we must accept its determination.

C.  Wrongful Nature of Retention

The third inquiry requires us to determine whether Patterson's retention of A.P. was wrongful. A retention is wrongful under the Convention only if it violates the petitioning parent's "'rights of custody,'" which "'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Abbott*, 560 U.S. at 11 (quoting Convention, art. 5). A parent's rights of custody are determined by "the laws of the country in which the child has his or her 'habitual residence.'" *Altamiranda Vale*, 538 F.3d at 583 (quoting Convention, art. 3). Our task, then, is to determine whether the retention of A.P. breached Baz's rights of custody under German law. The district court's interpretation of foreign law is a question of law that we review *de novo*. See FED. R. CIV. P. 44.1. In interpreting the content of German law, we "may consider any relevant material or source[.]" *Id.*; see also *Animal Science Prods., Inc. v. Hebei Welcome Pharmaceutical Co. Ltd.*, 585 U.S. 33, 42–43 (2018).

The district court properly concluded that Baz had rights of custody under German law. The German Consent Order specifically states that the joint parental care and custody required by the Illinois Allocation Judgment would remain in place. Dr. Andreas Hanke, an expert in German family law and procedure, testified that this settlement gave Baz joint custody rights under German law. Patterson did not dispute Dr. Hanke's interpretation of German law, nor did he submit evidence showing that he was authorized to retain A.P. in the United States at the time of retention. The balance of the evidence thus shows that Patterson's refusal to abide by the parental agreements, as evidenced by his efforts to seek sole custody and his claim to have agreed to the German Consent

Order under duress, breached Baz's rights of custody under German law.[5]

### D. Exercise of Rights of Custody

We arrive at the fourth and final inquiry: whether Baz was exercising her rights of custody at the time of the retention. "The standard for finding that a parent was exercising his custody rights is a liberal one." *Walker*, 701 F.3d at 1121. A person who has valid custody rights to a child under the law of the

---

[5] The dissent seems to look past the record evidence to find error in the district court's analysis. For example, as support for its suggestion that we should view Baz's request for relief from the German court in early 2023 as a breach of parental rights, the dissent speculates (without any apparent basis in the record) about possible motives underlying Baz's decision to seek relief from the German court. See *post* at 41, 44. (Conveniently absent from this theory is the fact that in January 2023 Patterson refused to hand over A.P.'s U.S. passport at the end of his parenting time, as required by the Illinois Allocation Judgment—a finding that, unlike any speculation about ill motives, was made by the district court and is amply supported by the evidence in the record.) The dissent also suggests that Patterson's claim to Bender that he agreed to the German Consent Order under duress "had no apparent effect" on Bender or the Illinois state court. *Post* at 44 n.6. But there is evidence that Patterson's claim did affect Bender, see *supra* n.2, and the record is silent on its effect on the Illinois state court.

We think it is unusual, to say the least, to fault the district court for not considering evidence not before it. The dissent's approach is also inconsistent with the standard of review adopted by *Monasky*. Under clear-error review, "[o]ur 'task on appeal[]' … 'is not to see whether there is any evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding.'" *United States v. Dickerson*, 42 F.4th 799, 804 (7th Cir. 2022) (quoting *United States v. Cruz-Rea*, 626 F.3d 929, 938 (7th Cir. 2010)). As we have said, the district court's findings of fact are plausible in light of the record evidence, and so our inquiry ends there.

country of the child's habitual residence "'cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.'" *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) (alteration omitted)). Nothing in the record suggests that Baz abandoned, or sought to abandon, A.P. Quite the opposite, the evidence shows that Baz actively sought to maintain regular contact with A.P. and that she was able to do so. That is enough to establish that she was exercising her rights of custody at the time of the retention.

## IV

We close with an important reminder. All that we have decided today is that A.P. was wrongfully retained away from his habitual residence, and that the Convention entitles Baz to have him returned to Germany. Our decision does not touch on any matters of custody. The Convention seeks to promote the best interests of the child by entrusting custody proceedings to the country where the child is at home. As we have explained, "[t]he merits of [a] child custody case—what a parent's custody and visitation rights should be—are questions that are reserved for the courts of the habitual residence." *Redmond*, 724 F.3d at 737 (quotation omitted). As such, if future custodial disputes involving A.P. should arise while his habitual residence remains in Germany, the task of resolving them will fall on the tribunals established in that country for the resolution of such issues. It is entirely possible that the German courts would conclude that they should defer to the Illinois Allocation Judgment, under principles of *lis pendens* or other doctrines. But that is a question that they, not we, must resolve. The Convention is an anti-abduction treaty; it "is not

a vehicle for resolving competing jurisdictional … claims in [an] underlying custody dispute." *Id.* at 740.

The judgment of the district court is AFFIRMED. The stay we issued in this case will dissolve when our mandate issues.

HAMILTON, *Circuit Judge*, dissenting. We should reverse the district court's order to return A.P. to Germany. The order was based on two important legal errors. Those errors, accepted by the majority, will make it significantly more difficult to resolve international child custody issues by agreement.

First, the district court gave no meaningful weight to the parents' May 2022 agreement, accepted and ratified by the court in Illinois, where both parents and the child had lived and where earlier custody issues had been adjudicated. The mother was about to leave the United States because her visa was expiring. The parents' agreement, called the Illinois Allocation Judgment, resolved a host of issues, including custody, visitation, schooling, and support. It also included agreement that the child's habitual residence for Hague Convention purposes would remain in Illinois as he would be traveling back and forth between the father in Illinois and the mother in Germany.

To encourage such fair and sensible agreements, courts should enforce them absent unusual circumstances threatening the well-being of the child. Cf. *Barzilay v. Barzilay*, 600 F.3d 912, 921 (8th Cir. 2010) (rejecting agreement that habitual residence would be nation where child had never lived).

The majority, by refusing to enforce the agreement based on nothing more than the parents having carried out its terms that allowed the child's temporary move to Germany, and despite the habitual residence disclaimer, signals that the father was indeed foolish to reach that agreement. The child was in Germany only temporarily, pursuant to the terms of the agreed Illinois Allocation Judgment. See generally *Monasky v.*

*Taglieri*, 589 U.S. 68, 78 (2020) (reason that child is present in one nation is relevant to habitual residence determination).

Under the reasoning of the district court and the majority, if the father wanted to ensure that the Illinois court retained legal control over the child's care, he should have eschewed any agreement. He should instead have fought in court in May 2022 to prevent the mother from taking the U.S.-resident child to Germany, even temporarily.

The district court's second legal error was holding that the father's act of supposedly "wrongful retention" under the Hague Convention was filing in the Illinois court a petition to modify custody. That holding is wrong for several reasons. Both parents had agreed the Illinois court would have continuing and exclusive jurisdiction over such matters. We should interpret the Hague Convention to encourage court involvement rather than self-help. And adding insult to injury, if we are going to treat any court petitions as acts of wrongful retention, the mother's earlier resort to a German court in February 2023 to seek sole custody was a far clearer breach. She tried to strip the father of his rights under the law of the child's habitual residence in Illinois. Moreover, the father filed his supposedly wrongful July 2023 petition only after the mother had refused to allow him to take the child to the United States on June 19, 2023. The mother's refusal was wrongful under both the Illinois and German court orders.

I. *Parental Agreements and the Hague Convention*

My greatest concern about the majority opinion is its failure to give much greater weight to the parents' agreement. That agreement offered a comprehensive resolution of custody, visitation, and support issues. Those issues were

especially challenging because the parents intended to live in different countries, though the mother had agreed her residence in Germany would be only temporary. Given the international dimension, a critical term of that agreement was that the United States would remain the child's habitual residence for purposes of the Hague Convention. In the absence of powerful contrary reasons, based on the best interests of the child, courts should respect and enforce such agreements.

Every step of the district court's and majority's reasoning begins with the finding that the child's habitual residence had shifted to Germany by July 2023. That finding contradicts the parents' agreement as set forth in the Illinois Allocation Judgment. The logic underlying that critical finding will undermine parents' and state courts' ability to resolve difficult family law disputes by agreement.

The majority and I agree that a child's country of habitual residence is a critical concept under the Convention, and the Supreme Court has held that habitual residence is a question of fact that must be determined based on the totality of the circumstances. *Monasky*, 589 U.S. at 77–78. The majority and I also agree that parents cannot contract their way out of the Convention, at least not *conclusively*. We also agree that, on the path the parents chose here in their 2022 agreement—to share custody and arrange for frequent trans-Atlantic travel, thereby giving the child strong ties to both nations—their actions toward the child would send mixed signals about his habitual residence. Some facts favored the United States and others Germany. See ante at 23 (acknowledging another judge might have come to a different conclusion on the child's habitual residence).

As a practical matter, courts have every reason to give such agreements great weight. Doing so will encourage parents to work out these problems by agreement rather than forcing parents toward premature, unnecessary, and corrosive litigation to establish sole custody or to prevent temporary relocations abroad. Giving such agreements great weight, subject to exceptions for serious threats to a child's best interests, is entirely consistent with the Supreme Court's decision in *Monasky*.

I can explain this concern best by looking back to May 2022 and the dilemma that this father and mother faced. The child was then five years old. He had been born in the United States as a United States citizen. He had lived his entire life in the United States. The father and mother had a difficult relationship, but they had managed for more than four years to share custody of the child and even a residence. But they all faced a crisis in May 2022. The mother's student visa was about to expire. Her efforts to find another way to stay in the United States legally had not been successful. Her departure from the United States was imminent.

The mother had a powerful and obvious desire to take her child with her, regardless of what the future might bring. The father also had a powerful and obvious desire to stay involved in the child's life. He could rightly fear that if he agreed to the mother taking the child to Germany, even temporarily, he would have no assurance the child would ever return or the mother would even let him visit.

What options were available to them? The Illinois court had the power to deny the mother's request to take the child to Germany. If the court did so and the mother wanted to stay a part of her son's life, she would need to figure out a way to

return to the United States legally, either permanently or temporarily, to see him on periodic visits.

The Illinois court also had the power to allow the mother to take the child to Germany, temporarily or even permanently. Once that happened, though, the Illinois court would have little if any power to protect the father's rights to stay involved in the child's life.

So should the Illinois court have allowed the removal or not? Either choice would have bad consequences for the child and both parents. Each parent risked a devastating and possibly permanent loss through further litigation.

The alternative was to work out an agreement—one in which both parents could have confidence. Facing those pressures, and with the help of the Illinois court and the child's guardian ad litem, the parents worked out the May 2022 Illinois Allocation Judgment.

That agreement was comprehensive. It certainly seems to have been fair to both parents and the child. It was a sensible solution to the dilemma the parents and child faced. Most important for present purposes, it also included carefully negotiated provisions for resolving disputes that might arise, including disputes under the Hague Convention.

Under the agreement, the parents agreed to joint custody and decision-making on major issues, including education and health care. The mother would take the child to Germany—temporarily—and would enroll him in school there. The father would have the child in the United States over the summer, Christmas holidays, and his school spring break, and would have parenting time with him in Germany during the autumn and late winter school breaks.

Several provisions emphasized the temporary nature of
the departure to Germany. Most important here, the parents
agreed that the habitual residence of the child would remain
in the United States, specifically in Illinois. Illinois Allocation
Judgment, Art. VI. They also agreed that the Illinois court was
the appropriate venue for resolving any disputes about the
child's custody, support, and so on. Art. VI(B). The mother
agreed to "continue to make efforts towards applying for tem-
porary or permanent Visas" for the United States and to re-
port to the father every six months on her progress. Art. III,
¶ 3.01(G). The parties also agreed: "Nothing in the order shall
aver or imply that either party has consented, or acquiesced
to the permanent removal of the child to or retention in any
country other than the United States of America." Art. VI(D).
Both parents also agreed to waive the Convention's one-year
"statute of limitations," agreeing that neither would raise as a
defense to a return order that the child had resided in a for-
eign state in excess of one year. Art. VI(C).

The agreement further specified that if "either party fails
to comply with the terms of this Order and fails to return the
minor child to the State of Illinois … then for purposes of any
proceedings or litigation under the Hague Convention" that
party will be responsible for attorneys' fees. Art. VI(F). This,
again, shows that the parties intended the child's move to
Germany to be temporary and that Illinois would continue to
be the child's permanent home.

After the move to Germany, disputes between the mother
and father arose, as they and the Illinois court had anticipated
might happen and for which they had planned. The agreed
plan was to address them in the Illinois court under the Illi-
nois Allocation Judgment. Both the district court and the

majority opinion effectively disregard the parents' fair and sensible agreement.

There can be no doubt that, as of May 2022, the child's habitual residence was the United States. The district court found, though, that the one year the child spent (primarily) with his mother in Germany under the terms of the Illinois agreement was sufficient to move his habitual residence to Germany. That reasoning caused the agreement effectively to self-destruct within a year. In May 2022, both parents and the Illinois court agreed (a) that the mother could take the child temporarily to Germany subject to the visitation and other terms, and (b) that the temporary removal to Germany would *not* change the child's habitual residence.

In other words, the district court blew up the Illinois agreement based only on events that were agreed, planned, and designed into the comprehensive agreement. There was nothing unexpected here, no external shock to disrupt the parties' expectations (such as an illness, a pandemic, civil disorder in one country, loss of a job forcing another international move, one parent's practical abandonment of the child, etc.).

Under these circumstances, in the interest of promoting agreed-upon resolutions of dilemmas like the one faced by this family in May 2022, courts should give much greater weight to such agreements. In this case, where no unexpected or unforeseeable factors would render the agreement contrary to the child's best interests, it should have controlling weight.

The majority, after explaining why it is disregarding the parents' agreement here, asserts "we do not suggest that the

habitual-residence provision of the Illinois Allocation Judgment carries no weight, nor do we imply in any way that either parent was foolish to make such an agreement." Ante at 21. With respect, that assurance strikes me as wishful thinking about a difficult issue.

Consider what happens the next time parents in the United States face a similar dilemma. One parent needs to leave the United States and would like to take a child along for more than a month or two. If the parent remaining in the United States cannot count on the courts to enforce an agreement like this one, that parent will have a powerful incentive to refuse to agree to even a temporary removal, no matter how much sense it might otherwise make for the parents and child. I do not know what advice the majority would give such a parent, other than to litigate to the bitter end before the other parent is allowed to travel abroad with the child. Such divisive litigation will be corrosive for both parents and for the child. It would be unnecessary if courts were willing to enforce agreements like this one.

The majority acknowledges that an agreement like this "will often be powerful evidence of 'the intentions and circumstances of caregiving parents,' which are 'relevant considerations.'" Ante at 21, quoting *Monasky*, 589 U.S. at 78. That's exactly the case here. All the evidence the district court relied upon to find a change in habitual residence consisted of actions that the parties had agreed to in the same Illinois court order in which they also agreed the move to Germany would not change the child's habitual residence. See *Monasky*, 589 U.S. at 78 (reason that child is physically present in a country is a factor when determining habitual residence). See also *Gitter v. Gitter*, 396 F.3d 124, 132 (2d Cir. 2005) (directing

courts to "pay close attention" to the intentions of the parents "to determine whether the child's presence at a given location is intended to be temporary, rather than permanent"); *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001) ("Despite the superficial appeal of focusing primarily on the child's contacts in the new country, … in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned."), abrogated on other grounds by *Monasky*; *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (reversing habitual residence determination partly because district court gave insufficient weight to the shared intent of the parents).

The goal of the Hague Convention was to discourage forum-shopping in international child custody disputes, both by literal abductions and refusals to comply with court orders. E.g., *Walker v. Walker*, 701 F.3d 1110, 1116 (7th Cir. 2012) (Convention serves "to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction"); *Mozes*, 239 F.3d at 1079 ("The Convention is designed to prevent child abduction by reducing the incentive of the would-be abductor to seek unilateral custody over a child in another country."); *Barzilay*, 600 F.3d at 922 (father engaged in "precisely the sort of international forum shopping the Convention seeks to prevent" by seeking to resolve custody disputes in Israel where he expected more favorable disposition than in United States where his children had lived for five years).

Yet the district court and majority have rewarded just such actions by the mother in this case. She told the Illinois court she wanted to take the child to Germany temporarily. She

assured the Illinois court and the father that she would "continue to make efforts towards applying for temporary or permanent Visas that enable her to travel to and from the United States." Illinois Allocation Judgment, Art. III, ¶ 3.01(G). She also promised to provide updates to the father every six months about her progress. *Id.* And of course she further agreed that any future disputes would be resolved through the Illinois court. Art. VI(B).[1]

---

[1] There is good reason to believe that the mother deliberately misled the Illinois court and the father in assuring them in May 2022 that she intended only a temporary stay in Germany, until she could obtain a visa for the United States. She told the German court that the Illinois guardian ad litem had "suggested that my son should stay with his father and I should live alone in Germany until my Green Card applications are decided. Since I had already read his report, and the prospect of losing my child was so distressing for me, my lawyer said we should tell the court that I would return if I got a Green Card. Otherwise, we might lose." A-54. This damning admission (understandable in human terms, but difficult for courts to tolerate, especially when both parents face similarly powerful pressures) was the subject of testimony in the district court. The court made no findings about the admission, which is difficult to reconcile with that court's ultimate decision. The majority seems to treat the district court's silence as an implicit credibility finding. Ante at 22. The better reading is that the district court simply failed to confront the force of this powerful evidence of deliberate deception.

It should be black-letter law under the Convention that a party should not be able to better her position by such deception, and that evidence of a child's acclimatization obtained wrongfully should be discounted in any habitual residence determination. See *Monasky*, 589 U.S. at 78 (explaining "that an infant lived in a country only because a caregiving parent had been coerced into remaining there … should figure in the calculus"); *id.* at 82 ("When all the circumstances are in play, would-be abductors should find it more, not less, difficult to manipulate the reality on the ground, thus impeding them from forging 'artificial jurisdictional links … with a

Then, the first time a dispute arose with the father, eight months after departing the United States, the mother did not go to the Illinois court. Instead, she filed an entirely new action in a German court seeking "transfer of sole parental custody" of the child. A-48. In doing so, she also appears to have lied to the German court when she swore: "The father has consented to a permanent move to Germany via court approval." A-52. He had done no such thing. He agreed to *temporary* removal under all the terms of the Illinois Allocation Judgment. The child's guardian ad litem also testified to the district court that it was the Illinois state court's understanding at the time of the May 2022 agreement that the move would be temporary—otherwise the Illinois court would not have approved the arrangement.

To sum up the point, by disregarding the parents' agreement and by effectively rewarding the mother's deceptive forum-shopping tactics, the decision in this case will make it more difficult for parents facing similar issues in the future to resolve them through fair agreements. That result is not required by the Convention nor by case law interpreting it. We should instead adopt not a bright-line rule that such agreements are always controlling, but a strong

view to obtaining custody of a child,'" quoting 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report in 3 Actes et documents de la Quatorzième session, p. 428 ¶ 11 (1982)); *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) ("a parent cannot create a new habitual residence by wrongfully removing and sequestering a child"). Cf. *Redmond v. Redmond*, 724 F.3d 729, 743 (7th Cir. 2013) (parent's removal of child from country A to country B was not wrongful, so district court did not error in giving weight to time child had spent in country B when determining habitual residence).

presumption that such an agreement about habitual residence should be honored absent extraordinary circumstances requiring otherwise in order to serve the best interests of the child. There are no such circumstances here, so we should honor the agreement and treat the United States as this child's habitual residence.[2]

## II. *Wrongful Retention*

The second major legal error in the district court's decision was finding that the father engaged in what the Hague Convention calls "wrongful retention." That finding triggered the mother's right to demand the remedy of return. The supposedly wrongful act was the father's filing of an ex parte petition for a temporary restraining order and preliminary injunction to bar the mother from contacting the child or removing the child back to Germany. The majority apparently endorses this theory. Ante at 24–25.

With respect, I believe this theory of wrongful retention is profoundly mistaken—both in general and especially on the specific facts in this case. I also believe this theory is incorrect even if the district court and majority were correct to find the child's habitual residence had switched to Germany.

As a general matter, asking a court with at least arguable jurisdiction to grant relief through fair legal procedures is hard to call wrongful. The central focus of the Hague Convention, after all, is international *abductions* of children. Putting

---

[2] The majority's emphasis on deferential appellate review might be understood to narrow the breadth of this precedent. That point about deferential review will not, however, offer meaningful comfort ex ante to a parent deciding whether to agree to or fight a temporary departure from the United States.

an issue of custody before a court, for the court to decide, is the antithesis of abduction or other extra-judicial self-help measures the Convention is meant to avoid. This case presents a disagreement about jurisdiction and choice of forum, not an abduction or wrongful retention of a child in the United States. See *Toren v. Toren*, 191 F.3d 23, 28 (1st Cir. 1999) (rejecting argument that mother's filing of custody complaint in state court when prior agreement between parents provided that custody disputes would be handled by Israeli courts was a wrongful retention because "it is in no way linked to the retention of children").

More specific to this case, even if some uses of one nation's courts might be deemed wrongful under the Convention, it's especially hard to call the father's action wrongful in this case. See, e.g., *Abou-Haidar v. Sanin Vazquez*, 945 F.3d 1208, 1217–18 (D.C. Cir. 2019) (wrongful retention occurred when mother unilaterally filed in D.C. courts brand new custody suit seeking permanent sole custody of child and informed father that she no longer intended to return to France with the child as previously agreed). Unlike the mother in *Abou-Haidar*, the father here asked for judicial relief *from the court that both parents had agreed would have jurisdiction* to decide all such questions between them. With respect, how can that be wrongful?

To declare that action wrongful, the mother, the district court, and the majority engage in circular reasoning. Whether the action is potentially wrongful depends on whether it violated the mother's rights under the law of the child's habitual residence. *Redmond v. Redmond*, 724 F.3d 729, 737–38 (7th Cir. 2013). In July 2023, when the father filed his petition in the Illinois court, he had every reason to think that Illinois remained the child's habitual residence. The mother had even

repeated her agreement to that point—*just a few weeks earlier*—by ratifying the Illinois Allocation Judgment in the German Consent Order on May 31, 2023.

Thus, the only reason the father's July 2023 court filing could be a "wrongful retention" was because the district court found, ex post, that the child's habitual residence had shifted to Germany immediately prior to that July filing. But this essentially punishes the father for a good-faith reliance on the May 2022 agreement, recently reaffirmed in the May 31, 2023 German Consent Order, just a few weeks before he filed his July 2023 petition. As discussed above, a disagreement over whether a court has jurisdiction to address a custody dispute is not in and of itself a wrongful retention.[3]

Adding to the irony and inconsistency here, consider events from a few months earlier, in February 2023. That's when the mother filed an entirely new case in a German court asking that court to award her sole custody. If the courts are going to treat *any* requests for judicial relief as wrongful under the Convention, the mother's action in February 2023 was an earlier and worse breach of the father's rights. See *Abou-Haidar*, 945 F.3d at 1217–18. The mother had agreed only nine months earlier that she would take no such action and that the Illinois court would retain exclusive jurisdiction over the child's custody, support, visitation, and so on. Back in February 2023, the case for treating Illinois as the child's habitual

---

[3] Perhaps further highlighting the oddities here, if the district court had ordered the child returned to Germany on the date of the alleged "wrongful retention," that order would have conflicted with the agreed terms of the German Consent Order providing the father with parenting time in the United States through the end of July 2023.

residence was even stronger than it was five months later in July.[4]

At that point, perhaps, under the majority's reasoning, the father would have been well-advised to launch his own Hague Convention petition in Germany for a court order returning the child to the United States. But we should not fault him for trying to work things out by further agreement, at least for a few months.[5]

Another odd aspect of the majority opinion is its conclusion that the father's "*efforts* to secure sole custody" of the child "breached [the mother's] rights of custody under German law." Ante at 24–25 (emphasis added). With respect, I do not see how an *effort* to modify the other parent's legal rights

---

[4] The majority says that this dissent goes outside the record to speculate here about the mother's motives. Ante at 25 n.5. Neither point is correct. I am not speculating about the mother's motives, which do not matter, at least under my view of the case. For the relevant facts, I am relying on her filings in the German courts. Those filings were before the district court and are before this court. See Resp. Tr. Ex. 14 at A-47–74. The details of the parents' dispute over just when, where, and how the father was supposed to turn over the child's U.S. passport in January 2023 show the kind of squabbles that often can arise between parents impatient and frustrated with each other. The salient point, though, is that the mother had agreed to address such foreseeable disputes before the Illinois court.

[5] The father's approach here is not fairly comparable to events in *Kijowska v. Haines*, 463 F.3d 583, 588–89 (7th Cir. 2006), cited by the majority on this point. We suggested in *Kijowska* that a father in the United States should have sought relief under the Convention in Poland, where the child was a habitual resident, rather than seek ex parte relief from a court in Illinois. In *Kijowska*, however, the father had previously disavowed interest in seeking custody, and there was no prior court case at all, let alone one in which the mother had agreed that a state court in the United States should decide custody and related issues.

in court violates those rights. See *Toren*, 191 F.3d at 28 (court filing seeking modification of visitation agreement was not wrongful retention). That question of rights is the question put to the court. If the effort is not successful, it's hard to find a violation. And if the effort is successful, it's even harder to find a violation of legal rights, at least subject to further review and appeal.

The district court's theory was that the father's going to the Illinois court in July 2023 violated the mother's rights under German law, as established under the German Consent Order of May 31, 2023. That was also a mistake. The German Consent Order recognized that the child was "living" with his mother at the moment, using the present tense. But it also ratified the Illinois Allocation Judgment, under which the German residence was supposed to be temporary and with no effect on habitual residence for Convention purposes. Remember, as well, that the Illinois Allocation Judgment fixed the Illinois court with "continuing and exclusive jurisdiction" over custody disputes. In the German Consent Order, both parents reaffirmed the Illinois Allocation Judgment, and nothing in the German Consent Order expressly displaced that provision or any other term of the Illinois Allocation Judgment. The German Consent Order was also only an interim agreement. It was temporary, to apply pending an anticipated broader and more permanent out-of-court agreement that the parents were never able to reach.

Moreover, by the time the father went to the Illinois court on July 7, 2023, the mother had already blown up the interim German Consent Order. That happened when she refused to allow the father to take the child to the United States on June 19 for the scheduled summer visit through the end of July.

The father had done what he had agreed to do under the German Consent Order. The day after it was signed, he submitted a translation of the order to the Illinois court. It was not the official translation (which was not available that quickly), but it was substantially correct and reliable. It communicated to the Illinois court that the father had agreed to withdraw pending requests to modify the Illinois agreement, including his March 2023 emergency motion requesting the court to give him sole physical custody.[6]

Under both the Illinois Allocation Judgment and the new German Consent Order, the mother clearly was required to allow the father to take the child on June 19 to the United States. She did not do so. If there was any wrongful retention in this case, that was it. (The majority recognizes this fact in its factual review, ante at 9, but ignores it in the key paragraph affirming the wrongful retention finding, ante at 16.) The mother's breach came several weeks before the father sought help from the Illinois court. Whichever country was correctly deemed the child's habitual residence as of June 19, 2023, the father had a legal right to that visitation under the court orders of *both* countries.

*Conclusion*

This is no doubt a difficult case, and I do not claim to know what arrangements are in the best interests of this child. That

---

[6] One of the best facts for the mother's case is that in early June, the father told the child's guardian ad litem in Illinois that he had agreed to the German Consent Order only under "duress." As best I can tell, however, neither the guardian ad litem nor the Illinois court gave any credence to that assertion. It was a mistake for the father to make that claim, but it had no apparent effect. See ante at 8 n.2.

sort of decision is beyond our role here, which is limited to deciding the appropriate forum for resolving the parents' disputes. I agree with my colleagues that, even under this court's decision, the German courts retain discretion to defer to the Illinois court under the Illinois Allocation Judgment. For the reasons explained above, however, the precedent set in this appeal is not required under the Convention or applicable precedents. This precedent will make it more difficult for families to reach agreements on international custody arrangements and to resolve new disputes when they inevitably arise. I respectfully dissent.